William Danson and Edith, his wife et al., Petitioners *v.* Robert E. Casey, State Treasurer, Commonwealth of Pennsylvania and Caryl M. Kline, Secretary of Education, Commonwealth of Pennsylvania, Respondents.

Argued October 4, 1977, before President Judge BOWMAN and Judges CRUMLISH, JR., WILKINSON, JR., ROGERS and BLATT.

*John R. McConnell,* with him *George E. Lieberman, Eugene F. Brazil,* and, of counsel, *Morgan, Lewis & Bockius,* for petitioners.

*Allen C. Warshaw,* Deputy Attorney General, with him *J. Justin Blewitt, Jr.,* Chief, Civil Litigation, and *Robert P. Kane,* Attorney General, for respondents.

OPINION BY PRESIDENT JUDGE BOWMAN, February 14, 1978:

This is a class action brought against the State Treasurer and the Secretary of Education by the School District of Philadelphia and a number of parents residing in that district who have children at-

tending Philadelphia schools. Petitioners seek to enjoin these state officials from implementing alleged unconstitutional statutes providing for state subsidies to public schools.

Petitioners have filed an amended petition for review relating to the 1977-78 school year in which they allege that while the School District would be able to operate for the full year by balancing its budget, it would be able to offer only a "truncated and uniquely limited program of educational services" due to lack of adequate funding. This scarcity is alleged to have resulted from the respondent officials' failure, under the challenged statutory system, to provide sufficient state aid to the Philadelphia School District. Petitioners claim this failure denies Philadelphia school children equal protection in violation of Article III, Section 32 of the Pennsylvania Constitution,[1] and deprives them of a thorough and efficient system of public education as mandated by Article III, Section 14.[2]

Respondents have filed preliminary objections in the nature of a demurrer seeking dismissal of the petition on the grounds that: (1) petitioners have failed to state a basis upon which relief can be granted; (2) petitioner School District has failed to state a cause of action as to itself; and (3) petitioner School District lacks standing to sue.

---

[1] Article III, Section 32, of the Pennsylvania Constitution states, *inter alia*, that

[t]he General Assembly shall pass no local or special law in any case which has or can be provided for by general law and specifically the General Assembly shall not pass any local special law:

1. Regulating the affairs of counties, cities, townships, wards, boroughs or school districts. . . .

[2] Article III, Section 14 requires the General Assembly to "provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth."

By virtue of respondents' demurrer we accept as true all well-pleaded facts in the petition for review, *Young v. Pennsylvania Board of Probation and Parole*, 29 Pa. Commonwealth Ct. 268, 370 A.2d 813 (1977), the salient features of which indicate that as of the date of the filing of the petition the District had exhausted its power to raise revenue; estimated expenditures exceed estimated revenues by $158,537,-299.00; which deficit required wholesale cutbacks in educational programs.[3] Petitioners claim that these reductions compromise the educational opportunity of Philadelphia's school children as compared with the educational opportunity of other school children throughout the state. In so doing, it is nowhere asserted that the complained-of injury is the result of any breach of individual duty or a mistaken application of the law. The sole substantive issue presented

---

[3] Paragraph 40 of the amended petition for review catalogues the effects of the budget deficit:

This reduction of $158,537,299 required a . . . curtailment of the normal program of educational services, including, among . . . other detailed programs:

a. The elimination of all kindergarten classes.

b. The elimination of all athletic programs.

c. The elimination of all extra curricular programs.

d. The elimination of almost all art and music programs.

e. The elimination of all librarians and library programs.

f. The elimination of all breakfast and lunch programs and services.

g. The elimination of almost all counselling. . . .

h. The elimination of approximately 536 teachers of reading.

i. The elimination of all busing for all the public, parochial and private school students heretofore served by the School District of Philadelphia, except for special education.

. . . .

by the lawsuit addresses the constitutionality of the current legislatively prescribed method of financing the public school system.

The common school system as we know it today finds its genesis in the Free School Act of 1834.[4] By 1865 the concept of a free public school as a state institution had become firmly established, and was finally solidified as a constitutional standard in Article X, Section 1 of the Constitution of 1874 which directed the legislature to maintain "a thorough and efficient system of public schools." Thus, "[t]he power of the State over education . . . falls into that class of powers which are made fundamental to our government." *Teachers' Tenure Act Cases,* 329 Pa. 213, 223, 197 A. 344, 352 (1938).

The organization of our public school system is today controlled by the Public School Code of 1949 (School Code).[5] Prior to 1963, except for enlarged school districts created by merger or consolidation, each local government unit was denominated as a school district grouped into one of five classes as determined by population. Under reorganization of school districts mandated by 1963 amendments to the School Code larger administrative units were established encompassing in most instances two or more existing school districts. The Philadelphia School District, however, remains as a single unit coextensive with the City and County of Philadelphia. It also comprises a separate intermediate unit (No. 26) incident to the creation of intermediate units throughout the Commonwealth,[6] the purpose of which is to coordinate activities of the school districts comprising each

---

[4] Act of April 1, 1834, P.L. 102.

[5] Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. §1-101 et seq.

[6] *See* Sections 901-A-924-A of the School Code, 24 P.S. §§9-951-74,

intermediate unit and to supply special programs and educational opportunities to school district members of a particular intermediate unit.

The School Code establishes a minimum schedule of services, which it is the duty of each board of school directors to implement. To finance this system, Section 507, 24 P.S. §5-507, vests in each school district "all the necessary authority and power annually to levy and collect, in the manner herein provided, the necessary taxes required, in addition to the annual State appropriation. . . ."

The School District of Philadelphia is, however, in a unique position with regard to this general delegation of the taxing power. The power of taxation, in all forms and of whatever nature, is the sole prerogative of the General Assembly, *Mastrangelo v. Buckley*, 433 Pa. 352, 250 A.2d 447 (1969), and although delegation of this power to municipalities and school districts without any definite restrictions has been upheld, such a delegation is impermissible when made to a nonelective body. *Wilson v. Philadelphia School District*, 328 Pa. 225, 195 A. 90 (1937).[7] By virtue of Section 302 of the School Code, 24 P.S. §3-302, the school board of each first class district is appointed. Therefore, whatever taxing power the Philadelphia School District has arises out of Section 17

---

[7] The taxing power . . . must be exercised through representatives chosen by the people. . . . [T]he power to tax has been delegated to and exercised by smaller units of state government, such as municipal bodies chosen by the people. . . . For, while the principal of nondelegation of taxing power is the general rule, delegation to municipal authorities has been recognized as lawful. . . . This is an exception to the general rule, but such delegation is kept within defined lines, with supervisory control always vested in elective bodies.
*Id.* at 229, 195 A. at 94 (citations omitted).

of the First Class City Home Rule Act[8] which empowers the elected municipal government to "exercise . . . any and all powers relating to its municipal functions . . . to the full extent that the General Assembly may legislate in reference thereto as to cities of the first class . . . ," and Section 1 of the Act of August 9, 1963, P.L. 640, as amended, 53 P.S. §16101 which defines the rather broad limits of the taxing power delegable to first class city school districts.[9] As nei-

---

[8] Act of April 21, 1949, P.L. 665, as amended, 53 P.S. §13131.

[9] This Section provides, inter alia:

(a) The council of any city of the first class, coterminous with a school district of the first class may, by ordinance, authorize the board of public education of such school district to impose taxes for the purposes of such school district on any persons, transactions, occupations, privileges, subjects, and real and personal property which may now or hereafter be taxable by such city for general revenue purposes, except that no such ordinance shall authorize the imposition of a tax on the wages, salary or net income of any person not a resident of such school district.

(b) The council of any city of the first class, coterminous with a school district of the first class may, in addition, by ordinance authorize the board of public education of such school district to impose a tax on the income of all kinds from the ownership, lease, sale, or other disposition of tangible and intangible real and personal property of persons who are residents of the school district. whether or not such income may presently be subject to tax by the city for general revenue purposes under the act of August 5, 1932 (P.L. 45), as amended. . . .

See also Section 652 of the School Code, 24 P.S. §6-652 which places a limit of eleven and three-quarter (11¾) mills on the dollar of the total assessment of all property assessed, and sets forth the criteria employable in ascertaining the tax. Section 2 of the Act of May 23, 1949, P.L. 1676, as amended, 24 P.S. §581.32 enumerates the classes of taxable personal property and defines the limits of the levy (1-4 mills). Section 1 of the Act of May 23, 1949, P.L. 1661, as amended, 24 P.S. §583.1 sets forth the permissible limits of real property taxes (1-1½ mills).

ther the school district nor the municipal government have interim taxing power, *Mastrangelo v. Buckley, supra,* the possibility of increased local financing lies solely in the School Board's power of persuasion over City Council, the ameliorative qualities of which would accrue at the earliest at the start of the School District's next fiscal year, July 1, 1978.

In its Statement of Available Funds and Expenditures appended to the amended petition for review, petitioners indicate three sources of revenue in addition to local taxation. These include State and Federal subsidies and contributions from the intermediate unit. Almost fifty (50%) percent of total available funds is provided by State contributions.

The formula used for the school subsidy includes three major elements: student enrollment; district spending per student; and the district's relative wealth.[10] Districts receive a payment for each child enrolled in school. Secondary children are "weighted" so that the weighted average daily membership (WADM) exceeds actual enrollment. The Commonwealth then undertakes to pay a percentage of the median actual instruction expense per WADM in the year for which reimbursement is to be payable. This "aid ratio" is computed by dividing the market value of the district's real estate by WADM and comparing it to the State average tax base per student. If the district and State tax base are equal, the district receives fifty (50%) percent of student cost. If the district base is lower, support is higher; if the base is higher, support is lower.

To assure the availability of uniform valuation statewide the State Tax Equalization Board (STEB) was formed and given the task of determining the market value of taxable real property in each school dis-

---

[10] *See* Sections 2501-02 of the School Code, 24 P.S. §§25-2501-02.

trict.[11]  These market values are then the standard by which district wealth is measured in the equalization formula.

By virtue of the Act of August 24, 1977, P.L.       , No. 59, two significant additions have been made to the subsidy formula.  A school district's personal income is valued per WADM and comprises forty (40%) percent of the aid ratio.  Second, a school district's tax effort is measured in determining the "base earned for reimbursement."  The more that effort sinks below the median statewide effort the more the figure to which the aid ratio is applied decreases.  Each school district is then paid by the Commonwealth on account of instruction of the district's pupils an amount determined by multiplying the market value/ income aid ratio times the actual instruction expense per WADM or by the base earned for reimbursement, whichever is less, and by the WADM for the district.

Districts receive, in addition, a dollar payment for each poverty-level or welfare student.  "Density" and "sparsity" payments are available for districts with high or low population per square mile.  These major payments for instruction are in turn supplemented by State participation in defraying the cost of the services incidental to that instruction, *i.e.*, transportation, health, drivers education, and technical and special education.

The current system is yet another step in continuing legislative attempts to correlate State aid formulae with local districts' needs and fiscal capacity.  Percentage equalization grants, as well as poverty, density and sparsity payments were nonexistent prior to 1966.  By virtue of the 1977 amendments to the School Code, local tax effort is weighed and income tax base is included in computing the aid ratio.  Interim mea-

---

[11] Act of June 27, 1947, P.L. 1046, *as amended*, 72 P.S. §4656.1.

sures increasing maximum subsidies payable on account of instruction, and minimum reimbursement per pupil have attempted to keep abreast of continuous educational and cost increases. *See for example,* Section 3 of the Act of June 26, 1974, P.L. 370, 24 P.S. §§25-2501-2502.5 (Cum. Supp. 1977-78).[12] The goal is to equalize educational opportunity and remove that opportunity from dependence upon the student's situs or status. Whether the proper nexus has been maintained between the elements of the subsidy formula and the professed goal has been a source of criticism.[13] We cannot help but take cognizance of the financial plight of our urban school districts generally, and Philadelphia in particular. The question, however, is not whether more dollars are needed. For the purposes of the demurrer this is conceded. Rather, the question is whether the criteria incorporated into the

---

[12] Prior to the August, 1977 amendments, the aid ratio, measured solely by the size of the real estate tax base standing behind each student was applied to the first $750 a district spent on each student (WADM). The State did not share any additional cost above $750. This ceiling figure was adjusted periodically by the General Assembly from an initial $400 in 1967-68 to the final $750 in 1974. As we have noted, the real estate tax base as the sole measure of district wealth, and the ceiling figure for student costs has been eliminated from the current formula.

[13] The criticism has centered upon the reliance placed in many subsidy formulae upon real property values, and the manner in which such formulae discriminate against property-poor districts. *See* Coons, Clune and Sugarman, *Educational Opportunity: A Workable Constitutional Test for State Financial Structures,* 57 Cal. L. Rev. 305 (1969). *See also,* Lindquist and Wise, *Developments in Educational Litigation: Equal Protection,* 5 J. L. & Ed. 1 (1976) for a synopsis of the case law in this area up to 1976. Additional criticism has been spawned by the uncertain nexus between the cost and quality of education, and the problems of urban districts in which municipal service costs are higher than in nonurban districts. *See* Comment, *Pennsylvania's State Aid to Education Formula: A Goal of Uniform Equalized Education,* 30 Pitt. L. Rev. 41 (1968-69).

State aid formula are so unrelated to the cost of maintaining a thorough and efficient public school system in districts of the first class as to rise to the level of an unconstitutional deprivation.

We turn now to the merits of respondents' objections.

*The constitutionality of Pennsylvania's subsidy formula*

Equal protection challenges to state subsidy formulae have been an issue heavily litigated in other jurisdictions with results so mixed, because of constitutional or statutory provisions peculiar to the states, as to be of little aid in resolving the issues here raised. The instant case comes to us subsequent to a dismissal in Federal district court of a civil rights action brought by the same class of plaintiffs alleging violation of the Equal Protection Clause of the Fourteenth Amendment.[14] The dismissal for failure to state a claim upon which relief could be granted followed the seminal decision of the Supreme Court in *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1 (1973), which held that since education was not a fundamental right for Federal constitutional purposes, and thereby not subject to strict judicial scrutiny, the traditional standard of equal protection review requiring only some rational relation to legitimate state purposes was appropriate. *Id.* at 29-37. Texas's system of financing public schools was held to satisfy this standard on the basis that "at every stage of its development it constituted a 'rough accommodation' of interests in an effort to arrive at practical and workable solutions." *Id.* at 55.

---

[14] *Danson v. Commonwealth,* No. 72-2448 (E.D. Pa., filed March 10, 1977).

This holding has, of course, been dispositive of Fourteenth Amendment equal protection challenges. *See, e.g., Danson v. Commonwealth, supra* note 14. In addition, similar equal protection analysis turning upon the "fundamentality" of the interest involved has been applied by many state courts operating within a constitutional system with equal protection guarantees similar to those contained within the U. S. Constitution.[15]

Although the Equal Protection Clause of the Federal Constitution and Article III, Section 32, of the Pennsylvania Constitution vary in content, their substantive application is not significantly different insofar as traditional equal protection analysis is concerned. *Baltimore & Ohio Railroad Co. v. Department*

---

[15] State courts are, of course, free to consider the merits of a constitutional challenge independent of United States Supreme Court opinions even when the State and Federal Constitutions are similarly or identically phrased. *See generally* Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489 (1977). Although public education is specifically required by forty-nine (49) state constitutions, *see* Comment, *State Constitutional Restrictions on School Finance Reform: Buse v. Smith*, 90 Harv. L. Rev. 1528 n.2 (1977) ; *San Antonio Independent School District v. Rodriquez, supra* at 112 n.69 (MARSHALL, J., dissenting), state court decisions have been disparate on the issue of fundamentality. *See Olsen v. State*, 276 Or. 9, 554 P.2d 139 (1976) ; *Thompson v. Engelking*, 96 Idaho 793, 537 P.2d 635 (1975) ; *Northshore School District No. 417 v. Kinnear*, 84 Wash. 2d 685, 530 P.2d 178 (1974) ; and *Milliken v. Green*, 389 Mich. 1, 203 N.W. 2d 457 (1972) ; *vac.*, 390 Mich. 389, 212 N.W. 2d 711 (1973), for the proposition that education is not a fundamental right. *See Buse v. Smith*, 74 Wis. 2d 550, 247 N.W. 2d 141 (1976) ; *Horton v. Meskill*, Conn. , 376 A.2d 359 (1976) ; *Serrano v. Priest*, 18 Cal. 3d 728, 135 Cal. Rptr. 345, 557 P.2d 929 (1976) ; and *Robinson v. Cahill*, 62 N.J. 473, 303 A.2d 273 (1973) holding that the respective state constitutions did create a fundamental right in education (though not all were decided on equal protection grounds, thereby obviating a result turning upon which equal protection "test" is applicable).

*of Labor and Industry,* 461 Pa. 68, 83, 334 A.2d 636, 643 (1975). Petitioners aver that the system of financing public education in the Commonwealth deprives Philadelphia school children of the "normal program" of "full" educational services which are allegedly available to all other children of the State. As Article III, Section 14, of the Pennsylvania Constitution purportedly creates a fundamental right to education, petitioners contend that the deprivations suffered by Philadelphia school children may only be justified by a compelling State interest. *See Shapiro v. Thompson,* 394 U.S. 618, 634 (1969). As no such interest is propounded by respondents, petitioners argue that Pennsylvania's system of financing education cannot withstand strict judicial scrutiny.[16]

"It is, [however], well settled that the prohibition of special laws does not forbid the Legislature from creating statutory classifications. Rather it requires only that a classification must have some rational relationship to a proper state purpose." *Tosto v. Pennsylvania Nursing Home Loan Agency,* 460 Pa. 1, 14, 331 A.2d 198, 204 (1975). Historically, the application of Article III, Section 32, has not turned on the "fundamentality" of the interest addressed by legislation, but whether the questioned classification "is founded

---

[16] If, as previous decisions have indicated, strict scrutiny means that the State's system is not entitled to its usual presumption of validity, that the State rather than the complainants must carry a 'heavy burden of justification,' that the State must demonstrate that its educational system has been structured with 'precision,' and is 'tailored' narrowly to serve legitimate objectives and that it has selected the 'less drastic means' for effectuating its objectives, the Texas financing system and its counterpart in virtually every other State will not pass muster.

*San Antonio Independent School District v. Rodriguez, supra* at 16-17 (footnotes omitted).

on real distinctions in the subjects classified, and not an artificial or irrelevant one used for the purpose of evading the constitutional prohibition." *Seabolt v. Commissioners of Northumberland County,* 187 Pa. 318, 323, 41 A. 22, 23 (1898) ; *see also Johnson v. Pennsylvania Housing Finance Agency,* 453 Pa. 329, 347, 309 A.2d 528, 538 (1973) ; *DuFour v. Maize,* 358 Pa. 309, 312-13, 56 A.2d 675, 677 (1948).

The application of this standard has resulted in a test, whereby a legislative classification will be given judicial sanction if *some* reasonable basis can be deduced to support it. The test being not wisdom, but good faith in the classification. *Seabolt v. Commissioners of Northumberland County, supra* at 323, 41 A. at 23. As a corollary, a rule has arisen that an act of the General Assembly cannot be declared unconstitutional unless it clearly, palpably and plainly violates the Constitution. *Longwood Villa Nursing and Convalescent Home Appeal,* 26 Pa. Commonwealth Ct. 620, 364 A.2d 976 (1976). Hence, a heavy burden befalls a constitutional challenge to legislative enactments.

Although our review of the cases cited above should indicate that we are unprepared at this juncture to dichotomize the test in challenges brought under Article III, Section 32, until our Supreme Court should so instruct, recent opinions indicate that there does exist a scale of societal values which proscribes a mechanistic application of the traditional rational basis standard of review. *See, e.g., Baltimore & Ohio Railroad Co. v. Department of Labor and Industry, supra* at 83 n. 11, 334 A.2d at 643 n. 11 ("The test is more stringent if the basis of the classification is 'suspect' or if it infringes upon a 'fundamental right' ").

It has been held that "[i]n considering laws relating to the public school system, courts will not inquire into the reason, wisdom or expediency of the legisla-

tive policy with regard to education, but whether the legislation has a reasonable relation to (a thorough and efficient system of public schools)." *Teachers' Tenure Act Cases, supra* at 224, 197 A. at 352. In statutes dealing with economics and social welfare, classifications are proper where reasonable and not invidious, *Workmen's Compensation Appeal Board v. Bethlehem Mines Corp.*, 23 Pa. Commonwealth Ct. 517, 343 A.2d 79 (1976). Even when considering legislation affecting a "fundamental" interest, "[a]ny classification must be reasonable, not arbitrary and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation so that all persons similarly circumstanced shall be treated alike." *Moyer v. Phillips*, 462 Pa. 395, 400-01, 341 A.2d 441, 443 (1975) (protection of reputation as a fundamental interest).

Applying this test, petitioners' Article III, Section 32, claim must fail. They contend that the subsidy formula "classifies" them disadvantageously by depriving them of enough dollars to supply the services they claim are available elsewhere throughout the State. The purpose of the School Code is to establish a thorough and efficient system of public education, and every child has a right thereto. To the extent that the Philadelphia School District receives a significant State subsidy that helps local government administer its delegated responsibilities, the School Code bears a rational relation to its avowed purpose. No portion of the subsidy formula has been attacked as compromising that goal with regard to Philadelphia's school children. No indicia have been pointed to which entail any characteristics inherent in these school children and discriminate against them accordingly. Nowhere is it asserted that Philadelphia receives less funds, either in gross or per student, than any other school district.

Although all educational financing cases are sui generis in the sense that the alleged deprivation is relative rather than absolute, we find no discrimination, invidious or otherwise, in a system that applies a uniform subsidy formula statewide, while at the same time adapting to community diversification by providing for local taxation. To the extent that it aids the promotion of a public school system, the subsidy formula is fair. To the extent that it provides no less than it makes available to other school districts, it is substantial. Given the varying interdistrict educational costs, and the uncertain nexus between the cost and quality of education, we cannot say, as a matter of law, that Pennsylvania's subsidy formula is not fairly and substantially related to ensuring a thorough and efficient system of public education.[17]

Petitioners' equal protection claim must fail in the end because they fail to present us with a justiciably cognizable class. We are not presented with a class of petitioners showing palpable injury due to low expenditures as measured by low district wealth. This controversy is presented to us solely within the context of the educational needs of the school children, a classification which we deem patently nonjusticiable. Article III, Section 14, expressly delegates to the legislature the responsibility of providing for education.

---

[17] Respondents cite *O'Leary v. Wisecup*, 26 Pa. Commonwealth Ct. 538, 364 A.2d 770 (1976) for the proposition that education is not a fundamental right. As *O'Leary* was concerned with a due process challenge to the denial by the appellee school district's refusal to provide appellant O'Leary a kindergarten education, and language therein regarding the fundamentality of the right to public education is predicated upon the absence of federal constitutional guarantees, and as our opinion today does not turn on the "fundamentality" of public education, we do not consider it to be of precedential value to the instant State Constitutional challenge.

"It is a well settled maxim that under our theory of the separation of powers of government, legislative, judicial and executive, the powers of each branch must be preserved to it; the legislature cannot delegate its powers to enact laws directly or indirectly to any other body or governmental agency." *Wilson v. Philadelphia School District, supra* at 228, 195 A. at 93. "Under (this) principle of separation of the powers of government . . . no branch should exercise the functions exclusively committed to another branch." *Sweeny v. Tucker*, 473 Pa. 493,   , 375 A.2d 698, 705 (1977). "Therefore all matters, whether they be contracts bearing upon education, or legislative determinations of school policy or the scope of educational activity, everything directly related to the maintenance of a 'thorough and efficient system of public schools,' must all times be subject to . . . legislative control." *Teachers' Tenure Act Cases, supra* at 225, 197 A. at 352. Petitioners request, in essence, a blank check approval of programs they have deemed are necessary for the maintenance of a thorough and efficient school system. While the petition for review does not present a "political question" in the sense that we have adjudicated with regard to the legitimacy of Pennsylvania's subsidy formula, there are no judicially manageable standards apparent to us, either in the Public School Code or the Constitution, which would enable us to assume the role selected for us by petitioners. *See Sweeny v. Tucker, supra* at   , 375 A.2d at 706; *see also McInnis v. Shapiro*, 293 F. Supp. 327 (N.D. Ill. 1968), *aff'd mem. sub. nom., McInnis v. Ogilvie*, 394 U.S. 322 (1969).

Although we subscribe to the view that Article III, Section 14, does impose a duty upon the legislature to provide equal educational opportunity to the Commonwealth's school children, and that this duty exists separate and apart from the proscription against spe-

cial laws contained within Article III, Section 32, we see no reason to apply a test under this section any different from the fair and substantial relation test applied in our equal protection analysis. We do not interpret the mandate to "provide for a thorough and efficient system of public education to serve the needs of the Commonwealth" as to require absolute equality in educational services or expenditures, but rather equality in the relative sense of adapting to local conditions. Challenges predicated upon similar constitutional provisions have succeeded in other jurisdictions by virtue of the reliance placed in those jurisdictions upon local real property tax base in determining either the permissible level of local taxation or the limits of state subsidies, and the manner in which such reliance discriminates against poorer districts. *See Serrano v. Priest,* 5 Cal. 3d 584, 487 P.2d 1241, 96 Cal. Reptr. 601 (1971); *see also Horton v. Meskill, supra* note 15. We find no such undue reliance in Pennsylvania's equalization grant formula. A state aid system weighing district density or sparsity, poverty, number of students, cost per student and district wealth measured by income and equalized real property assessments bears a facially fair and substantial relation to promoting equal educational opportunity. Any compromises of that effort are the result of what we feel to be legitimate and strong state objectives of maintaining state and local control and distributing exiguous sums among the many school districts. We believe that petitioners' generalized attack upon the State system of financing the public school system vis-a-vis its impact upon the Philadelphia School District fails to state a cause of action. As this holding disposes of the substantive issues presented by the petition for review, we need not pass on the remaining procedural issues presented by the respondents' preliminary ob-

jections regarding the School District's standing to sue.

ORDER

Now, February 14, 1978, the demurrer of respondents is sustained and the petition for review is dismissed.

---

DISSENTING OPINION BY JUDGE ROGERS:

I respectfully dissent.

The only question before us on these preliminary objections is that of whether the complaint of the School District of Philadelphia and the class consisting of the pupils and parents of pupils of that school district, states a cause of action.

The plaintiffs allege that for the school year 1977-1978 the School District estimated as the minimum expenditure necessary to provide a normal program of educational services the sum of $669,439,299. Revenues, including local taxes, for the same year could not be obtained in an amount exceeding $510,902,000, leaving an estimated deficit of $158,537,299. They further allege that this estimated deficit caused the School District to curtail its normally provided education services by: eliminating all kindergarten; eliminating all athletic programs; eliminating all extracurricular programs; eliminating all art and music programs; eliminating all librarians and library programs; eliminating all breakfast and lunch programs; eliminating all counselling services; eliminating 536 reading teachers; and eliminating all busing, except for special education. These services eliminated by the financial stringency of the plaintiff School District, the plaintiffs say, are under the laws of Pennsylvania provided to public school children in every school district in the State of Pennsylvania, except

the pupils of the School District of the City of Philadelphia.

The plaintiffs allege that the reason why the public school children of the School District of Philadelphia are so disfavored lies in the laws of Pennsylvania which *uniquely* provide the School District of Philadelphia with an appointed School Board without the power to tax local subjects. This power in Philadelphia resides in City Council. City Council's failure to approve local tax levies adequate to provide normal educational programs and services, together with the State's failure to provide sufficient subsidies have, the plaintiffs allege, combined to create the disparity between the programs offered in Philadelphia and those offered in every other school district in the State. This legal system producing this unequal result, the plaintiffs contend, denies the public school children of Philadelphia an education of a quality equal to that enjoyed by other Pennsylvania children contrary to Article III, Section 32 of the Pennsylvania Constitution and denies them the benefits of the thorough and efficient system of public education required to be provided by Article III, Section 14 of the same Constitution.

The factual allegations of the Complaint must for the purposes of the demurrer be accepted as true. In my opinion they state a cause of action which it is our responsibility to require be answered and heard on the merits.

As for relief, surely this Court could strike down a system of laws which unconstitutionally deprives school children of equal educational advantages and of the thorough and efficient education promised by the State Constitution; and surely we could vindicate those rights by enjoining the defendants from approving or paying subsidies to school districts other than Philadelphia meanwhile.

I would overrule the preliminary objections. Judge CRUMLISH, JR. joins in this dissent.