JoAnne Fischer, et al., Petitioners *v.* Department of Public Welfare, et al., Respondents.

Heard February 7, 1984, before Judge MacPhail.

*Kathryn Kolbert*, with her, *Susan Cary Nicholas, Seth Kreimer* and *Robert F. Williams,* for petitioners.

*Andrew S. Gordon,* Senior Deputy Attorney General, with him, *Daniel R. Schuckers,* Deputy Attorney General, *Allen C. Warshaw,* Senior Deputy Attorney General, Chief, Litigation Section, *LeRoy S. Zimmerman,* Attorney General, and *Stanley Slipakoff,* Assistant Counsel, Department of Public Welfare, for respondents.

*Nadine Taub,* with her, *Pamela Pryor Cohen, Swenson and Cohen,* for Amici Curiae of The National Women's Health Network et al.

*William Bentley Ball,* with him, *Philip J. Murren* and *Sandra E. Wise, Ball & Skelly,* for Amici Curiae, Dr. Dorothy Czarnecki et al.

MEMORANDUM OPINION BY JUDGE MACPHAIL, March 9, 1984:

On December 19, 1980, the Pennsylvania General Assembly amended the Public Welfare Code by adding a section[1] (hereinafter Act of 1980) which provided that no funds of the Commonwealth and no federal funds appropriated by the Commonwealth should be used to fund abortions unless (1) a physician certified that the life of the mother would be endangered if the fetus was carried to full term or (2) the pregnancy resulted from rape or incest when such rape or incest is reported promptly[2] to a law enforcement agency or public health service. The text of the Act

---

[1] Section 453 of the Public Welfare Code, Act of June 13, 1967, P.L. 31, *as amended,* added by Section 1 of the Act of December 19, 1980, P.L. 1321, 62 P.S. §453.

[2] The Department of Public Welfare promulgated regulations in 11 Pa. B. 657 (1981) which defined prompt reporting in the case of rape as that which must be done within 72 hours of the occurrence of the rape and, in the case of incest, that which must be done within 72 hours from the time the victim was advised she was pregnant.

of 1980 followed very closely the language of the "Hyde Amendment"[3] which prohibited the use of any federal funds for reimbursement of the cost of abortions under the federal Medicaid program except under certain specified circumstances.

Petitioners, consisting of named individuals suing on behalf of themselves and others similarly situated, a clergy person suing on behalf of himself and all others similarly situated, a physician and several non-profit organizations who render medical services including medically necessary abortions to the public generally and to persons receiving Medical Assistance from the Pennsylvania Department of Welfare, filed a petition for review in this Court seeking declaratory and injunctive relief which would prohibit the Respondents[4] (collectively hereinafter Commonwealth) from implementing the provisions of the Act of 1980. While pre-trial discovery was proceeding, Petitioners filed a petition for preliminary injunction which, after hearing, was granted by this Court. An appeal from that order was filed with our state Supreme Court which affirmed the action of this Court. *Fischer v. Department of Public Welfare*, 497 Pa. 267, 439 A.2d 1172 (1982).

While the instant case was proceeding through the pleading stage,[5] the General Assembly enacted the

___

[3] Pub. L. No. 96-123, §109, 93 Stat. 923, 926 (1979). This was a joint resolution of Congress providing appropriations for fiscal year 1980.

[4] The Department of Public Welfare, the Secretary of Public Welfare, the Governor of the Commonwealth and the Deputy Secretary for Medical Assistance of the Pennsylvania Department of Public Welfare.

[5] Preliminary objections by the Commonwealth including a demurrer were denied by an equally divided Court. *Fischer v. Department of Public Welfare*, 66 Pa. Commonwealth Ct. 70, 444 A.2d 774 (1982). Although we certified under the provisions of Pa. R.A.P. 1312(a)(2) that our order involved a controlling question of law

Abortion Control Act[6] (Act of 1982). That statute has been challenged and its implementation preliminarily enjoined in the federal courts.[7] Petitioners here amended their original petition for review to include the provisions of the Act of 1982, specifically 18 Pa. C. S. §3215(c). Thereafter, a second amended petition for review was filed and, at trial, this Court permitted further amendments to that pleading.[8]

After the disposition of other pre-trial motions including the withdrawal of Count III relating to Petitioners' alleged right of free exercise of religion and conscience under the Constitutions of the United States and Pennsylvania, the matter came on for trial. At trial, the Court was presented with 393 stipulations of fact and 11 exhibits whose authenticity was stipulated. The Commonwealth objected to the materiality of most of the stipulations, the right to do so having been specifically reserved by the parties. By pre-trial order some of those objections were sustained.[9] Peti-

---

as to which there was substantial ground for difference of opinion and that a timely resolution of the issue would materially advance the ultimate termination of the case, our Supreme Court declined to assume jurisdiction of the interlocutory order.

[6] Act of June 11, 1982, P.L. 476, 18 Pa. C. S. §§3201-3220.

[7] The order of the Third Circuit Court of Appeals was filed December 22, 1982 in *American College of Obstetricians and Gynecologists v. Thornburgh*, (No. 82-1785). The order of that Court specifically stated that its enjoining of the Act of 1982 "leaves in effect Pennsylvania's present Abortion Control Act and its regulations." We thus deem it necessary to address the provisions of both statutes since neither can be implemented at the present time.

[8] The last amendments merely added the federal constitution to paragraphs 110, 113(a)(b)(c), 118, 119 and 120(a)(b) of the petition which allege the infringement of Petitioners' constitutional right to privacy.

[9] Paragraphs 33, 163-167 inclusive, 253-255 inclusive, 257-258 inclusive, 344-345 inclusive, and 347-349 inclusive were held to be inadmissible because immaterial. Petitioners withdrew paragraph 132.

tioners presented four witnesses and 15 exhibits at trial. The Commonwealth presented no evidence other than the stipulated facts, its position being that the issues to be determined were matters of law rather than those of fact. Pre-trial and post-trial briefs were received. Throughout the entire proceedings, the Chancellor has been impressed with the competence, diligence and courteousness of counsel. In a case fraught with so much emotion and deep feelings, it was refreshing to have counsel focus on the legal issues to the complete exclusion of other extraneous matters.

### Findings of Fact

We find as facts all of the stipulated uncontested facts except those we refused to admit on grounds of materiality.[10] We deem it unnecessary to extend the length of this adjudication by reproducing those stipulations herein seriatim; rather, we will briefly summarize the salient facts required to support our conclusions of law.

Some Petitioners were indigent pregnant women financially dependent upon Medical Assistance from the Commonwealth who were not victims of rape or incest and who had been advised by their individual physicians to have abortions because should they carry the fetus to term, they would risk serious jeopardy to their health; but the physicians could not certify that an abortion was necessary to preserve the Petitioners' lives. If the pending legislation had been implemented, those persons and others similarly situated could not receive abortions funded by Medical Assistance.[11] Physicians, including a named Petition-

---

[10] *See* note 9 *supra.*

[11] The standing of these individual Petitioners has been challenged at trial. No preliminary objections to the second amended petition for review have been filed, nor was the standing issue raised

er, who provide clinical and private medical services including abortions to pregnant women, who receive Medical Assistance and who would be financially unable to pay for such abortions if the proposed legislation was implemented, would not perform medically necessary abortions for those persons. Such patients of such physicians may attempt self-induced abortions.

Several of the Petitioners are non-profit corporations who serve and educate the public in matters relating to human sexuality, birth control, population control and related subjects. These organizations also provide for medically necessary abortions to women receiving Medical Assistance, some of whom are victims of rape or incest.

The Commonwealth's Medical Assistance program by statute and regulation is designed to render medically necessary services to those who qualify. Among those medically necessary services rendered prior to the enactment of the subject legislation were necessary abortions which were carefully and specifically delineated as to necessity, timing, description of providers, manner of payment and utilization review. Certain broad categories of medical services and 24 specific medical services are not considered to be eligible for reimbursement under the Commonwealth's Medical Assistance program because such services are deemed to be medically unnecessary, e.g. experimental, cosmetic, and programs subject to fraud or abuse. Although the Department of Public Welfare (DPW) has on occasion waived these specific exemptions in the circumstances of a given case, the Commonwealth will refuse to fund abortions even where medical necessity and special need can be demonstrated. If the

in the answer of the Commonwealth. We take the position that unless the issue is raised by preliminary objection or by answer, it has been waived. *Erie Indemnity Co. v. Coal Operators Casualty Co.*, 441 Pa. 261, 272 A.2d 465 (1971).

proposed legislation were to be implemented, abortions would be the only generally acceptable, medically necessary surgical procedure not reimbursable under the Commonwealth's Medical Assistance program. The Commonwealth has no evidence that abortions funded by Medical Assistance are the subject of widespread fraud or abuse.

All reproductive services for males are covered by Medical Assistance; all female reproductive services except abortions would be covered by Medical Assistance if the proposed legislation were to be implemented.

The Commonwealth furnishes some medical services under its Medical Assistance program which are neither required by the federal government nor reimbursed by the federal government.

In 1981, 1982 and 1983 approximately 12,000 medically necessary abortions were obtained annually by indigent women in Pennsylvania and paid for under the Commonwealth's Medical Assistance program. It is estimated that that figure will remain constant for the year 1984 and the foreseeable future. More than five times that number of abortions were obtained in Pennsylvania by women who did not seek or qualify for Medical Assistance to fund such abortions.

The average cost for a first trimester abortion in a hospital is $322.00 plus the physician's fee, $295.00 in a physician's office and $190.00 in a clinic.

It is extremely unlikely that women eligible for Medical Assistance have purchased health insurance that will cover the cost of abortion or that they will be able to accumulate more than minimal funds for an emergency.

In 1981, 12% of the women receiving abortions in Pennsylvania were 17 years of age or younger and 29% were 19 years of age or younger. Pregnancy

among teenagers is a major public health problem with serious medical, health, educational, social, psychological and vocational implications for the mother and child. Children born to mothers age 15 and younger are 2.4 times more likely to be born with neurological defects than those born to women ages 20 to 24.

Women over the age of 35 have significantly more problems in pregnancy than women in their 20's and early 30's. A woman 40 years old is one hundred times more likely to die as a result of a pregnancy than a woman 22 years old.

The normal physical and emotional stress problems attendent in any pregnancy are more pronounced among indigent women and particularly among black indigent women. For example, black women are three times as likely to die during pregnancy as are white women.

If Medical Assistance funds are not available for medically necessary abortions in Pennsylvania, approximately 4,000 of those women who are in need of an abortion, will have no alternative other than to bear their pregnancy to term. Some of these women are likely to be afflicted with debilitating diseases prior to pregnancy and will have complications for that reason resulting from a pregnancy carried to term. In some such cases, stress will be increased to a point where suicide may be attempted.

If the proposed legislation were to be implemented, at least 98% of the abortions funded by the Medical Assistance program before February 15, 1981 and currently so funded will no longer be eligible for such funding.

If the proposed legislation were to be implemented, approximately 8,000 Medical Assistance eligible women in need of abortion services will proceed with the abortion and pay for it from their own or borrowed funds.

There is a substantial dispute within the medical profession as to the effects of abortion on subsequent pregnancies. Pregnancy does interfere with the diagnosis and treatment of other diseases such as cancer, thyroid disease and blood clotting disorders.

If a person eligible for other medically necessary benefits cannot obtain an abortion, she is likely to delay an abortion in order to obtain funding, thus increasing the likelihood of injury to her health. This would be true especially of teenagers.

Because pregnancy is a progressive condition, physicians, with very few exceptions, find it difficult if not impossible to predict with any degree of certainty at an early stage of pregnancy whether a patient will die or be placed in a life threatening situation at a later stage of the pregnancy. The requirement that to qualify for funding of an abortion under the Medical Assistance program, a physician must certify that the abortion is necessary to preserve the life of the patient or to avert the death of the patient is a criterion different from that applied to all other medical services eligible for reimbursement.

Rape is the most underreported crime in the country. In the fiscal year 1982-1983, 5,607 rape victims contacted rape crisis centers in Pennsylvania. Forty percent of those calling were under the age of 18. A woman in Pennsylvania stands between one chance in fifteen and one in thirty of being raped at least once in her lifetime.

Rape is an intensely personal invasion into the victim's privacy. The trauma of rape results in a complex of emotional reactions commonly called the "rape trauma syndrome," the early stages of which is known as the acute phase of disorganization, lasting from a few days to a few weeks. There are varying emotional responses such as shame, guilt, fear and anger. Abortion is a medically necessary option for most if not all

pregnant victims of rape because the physical and emotional effects of bearing the pregnancy to term can be severe.

In Philadelphia, when rapes are reported to the police, there is a pelvic examination, the necessity of testifying at trial, the making of a detailed statement of what occurred, confronting the perpetrator of the crime and possibly submitting to a polygraph test.

Criteria for determining whether a prosecution will occur in a rape case varies from county to county. Some counties have specialized forces trained and/or sensitized to rape cases; most do not.

Because of underreporting, reliable statistics on the incidence of incest are virtually unobtainable. Of the 7,380 substantiated cases of child abuse injuries in 1982, 225 were cases of incest, 132 were rapes and 173 were statutory rapes. The ages of the victims ranged from under one year to age seventeen. Child sexual abuse includes rape and incest. There is a disproportionate number of cases of reported child sexual abuse among poor families. In most cases, birth control is not practiced.

Child victims of incest who become pregnant may be damaged severely both physically and psychologically by the pregnancy. Abortion is a medically necessary option for most if not all victims of incest because the physical and emotional effects of bearing a pregnancy to term can be severe. Such victims often become runaways, juvenile offenders, drug and/or alcohol addicts or prostitutes. Some child victims fear physical or other psychological abuse by the perpetrator if they report the sexual abuse. Some victims will attempt to hide evidence of the abuse for years. Some, but not most, law enforcement officials have been trained to deal with victims of child sexual abuse.

There are no limitations on the use of reports made to law enforcement agencies and/or public health of-

ficials pursuant to the legislative acts in question or regulations promulgated thereunder. Reports of rape and incest are treated with different degrees of confidentiality in the various counties of the Commonwealth.

From the testimony of the witnesses heard at trial, we find the following additional facts:

1. A dilation and curettage operation which will terminate a pregnancy would not be excluded by the statutes at issue.

2. Where the issue is whether or not the life of the mother would be endangered if the fetus is carried to full term, DPW will be imposing its judgment on that of the medical profession.

3. In the state of Ohio where statutes similar to those at issue here have been implemented, the result has been stress, delay, economic deprivation and special problems with teenagers.

4. Somewhere between 50 and 90 percent of rape victims never report to the police. Sometimes this is because they suffer unconsciousness, total amnesia and physical brutality. The emotional responses to rape of fear, shock and shame are most noticeable the first few days but tend to subside over a longer period of time. Other reasons for non-reporting include poor treatment and understanding by the police, personal knowledge of the victim and/or the assailant by the police in small communities, potential harm to the victim and/or the victim's family members from the assailant when released on bail and tactics of defense lawyers.

5. Black women are much more likely to delay reporting rape than are white women.

6. Rape or incest victims who do not qualify for abortions and cannot afford them, must ultimately

face the traumatic event of carrying a fetus to full term and having a child who is a personification of the worst event in the victim's lifetime.

7. The requirement of reporting will not promote prompt reporting even though the funding for an abortion may be lost because some victims of rape and/or incest simply are psychologically or physically unable to perform the act of reporting regardless of what is at stake.

8. The requirement of reporting will not increase the probable veracity of the claim that a crime has been committed.

9. The requirement of reporting places child victims into two categories. The child may be a victim of rape or the child may be a victim of incest.

10. Most children do not report incestuous conduct because they cannot articulate what is occurring. Reports by children of incest or rape to family members or public authorities are viewed as suspect by those to whom the event is reported because adults frequently perceive that children tend to imagine or fantasize the event.

11. Naming the abuser in an incest case would be a terrifying experience for a young victim fearing reaction from the perpetrator as well as other family members.

12. Twenty-five percent of incest victims become pregnant. The ratio is greater among victims of incest than those of rape because incestuous conduct is usually long term and progressive whereas rape is usually a one time occurrence.

13. The requirement of reporting incest will not increase the amount of reporting that presently occurs; nor will it enhance the probabilities of the veracity of the complaint.

228

DISCUSSION

1. Introduction

It seems appropriate, initially, to quote from Judge CRAIG's opinion in support of overruling the Commonwealth's preliminary objections:

> At the outset, we note that this case does *not* involve any question of the legality or the morality of medical abortion, the constitutional status of which was initially decided in Roe v. Wade, 410 U.S. 113 (1973).

> Instead, the ultimate principal issue here is whether a state law may withhold financial aid for a medical abortion needed to preserve the health of an indigent woman and allow it only if her very life is endangered, while not applying any similar limitation to other medical procedures necessary for health preservation alone —recognizing also that the nonindigent woman faces no such distinction. (Emphasis in original; footnote omitted.)

*Fischer,* 66 Pa. Commonwealth Ct. at 82, 444 A.2d at 780.

Petitioners' constitutional challenges to the legislation at issue are grounded upon the equal protection clauses of the Constitution of Pennsylvania,[12] the so-

---

[12] Pa. Const. art. I, §§1, 26 and art. III, §32. Although Petitioners have argued that Article I, Section 26 of the Pennsylvania Constitution provides greater equal protection gurantees than Article III, Section 32, our research has failed to disclose any significant or substantive difference in the treatment of these provisions by Pennsylvania courts. We also have not discovered any movement by the courts to employ Article I, Section 26 as a vehicle to broaden equal protection guarantees under the Pennsylvania Constitution. *See, e.g., Astemborski v. Susmarski,* 502 Pa. 409, 466 A.2d 1018 (1983); *Workmen's Compensation Appeal Board v. Bethlehem Mines Corp.,* 23 Pa. Commonwealth Ct. 517, 353 A.2d 79 (1976). We, accordingly, will address all of the equal protection challenges as a unit.

called Equal Rights Amendment of the Constitution of Pennsylvania[13] and the right to privacy under the state and federal constitutions.[14] The equal protection and equal rights challenges attack the legislation as a whole. The right to privacy challenge is limited to those provisions of the legislation containing the reporting requirement in the event of rape or incest.

For our own convenience, we will treat the general challenges to the legislation separately from the challenges to the rape and incest provisions.

2.   Constitutionality of statutory language limiting funding for abortions for indigent women to instances where such abortions are necessary to avert the death or preserve the life of the mother

In large part, the Commonwealth's case rests upon the decision of the United States Supreme Court in *Harris v. McRae*, 448 U.S. 297 (1980) where the Court upheld the Hyde Amendment which limited the use of any federal funds for reimbursement of the cost of abortions under the Medicaid Program to situations where the life of the mother would be endangered if the fetus were carried to term or where the mother was a victim of rape or incest which had been promptly reported to a law enforcement agency or public health service. In making its decision, the United States Supreme Court specifically rejected due process, equal protection and establishment clause challenges under the Constitution of the United States. Inasmuch as the statutory language in the legislation at issue here is virtually identical to the Hyde Amendment and the equal protection clauses of the State and Federal Constitutions have been construed in like

---

[13] Pa. Const. art. I, §28.

[14] Pa. Const. art. I, §1 and art. III, §32; U.S. Const. amends. I, IV, V, IX and XIV.

fashion, the Commonwealth would have us conclude that the issue is settled. We must respectfully disagree.

Our State Supreme Court has held that where the provisions of our state constitution are being construed, including the equal protection clause, the state courts are not bound by decisions of the United States Supreme Court but should be guided by the same principles as are employed by that Court. *Kroger Co. v. O'Hara Township*, 481 Pa. 101, 392 A.2d 266 (1978). In such cases, the opinions of the United States Supreme Court are entitled to whatever weight their reasoning and intellectual persuasiveness warrant. *Commonwealth v. DeJohn*, 486 Pa. 32, 403 A.2d 1283 (1979), *cert. denied*, 444 U.S. 1032 (1980). Our own Court has held that even when the state and federal constitutions are similarly or identically phrased, we are free to consider the merits of a state based constitutional challenge independent of the United States Supreme Court. *Danson v. Casey*, 33 Pa. Commonwealth Ct. 614, 382 A.2d 1238 (1978), *aff'd*, 484 Pa. 415, 399 A.2d 360 (1979). We conclude that *Harris* is not binding upon us.[15] As indicated by our own Supreme Court in *Fischer v. Department of Public Welfare*, several of our sister states have considered state legislation similar to the Hyde Amendment and found such legislation to be violative of state constitutional guarantees notwithstanding the United States Supreme Court decisions in *Harris* and *Maher*. *Planned Parenthood Association v. Department of Human Resources*, Or. Ct. App. , 663 P.2d 1247 (1983); *Right to Choose v. Byrne*, 91 N.J. 287, 450 A.2d 925 (1982); *Committee to Defend Reproductive Rights v.*

---

[15] For the same reason we do not believe that we are bound by *Maher v. Roe*, 432 U.S. 464 (1977), a case strongly relied upon in *Harris*.

*Myers,* 29 Cal.3d 252, 625 P.2d 779 (1981) and *Moe v. Secretary of Administration and Finance,* 382 Mass. 629, 417 N.E.2d 387 (1981).

Our own analysis of the legislation now before us leads us to conclude that the funding restriction imposes an undue burden upon the fundamental right of indigent women to have a medically necessary abortion. That conclusion is based upon our understanding that *Roe v. Wade,* 410 U.S. 113 (1973) has determined that a woman has a constitutionally protected fundamental right to her own decision of whether or not to terminate her pregnancy. This constitutional right was found to exist as a part of a citizen's right to privacy under the First, Fourth, Fifth, Ninth and Fourteenth Amendments of the United States Constitution. Although the right is not absolute, it is fundamental. Where fundamental constitutional rights are involved they may be disturbed only upon a finding of a compelling state interest. *Fabio v. Civil Service Commission,* 489 Pa. 309, 414 A.2d 82 (1980). *Roe v. Wade* also held that a state's interest in potential life may never outweigh the superior state interest in the life and health of the mother; this is true even though the state has two separate and distinct interests—the health of the mother and the potentiality of human life.

In the instant case, the burden upon indigent pregnant women readily appears from the stipulated facts. Of the 12,000 women per year who would otherwise receive a medically necessary but not life threatening abortion in Pennsylvania, 4,000 will be compelled to carry their pregnancy to term because they will have no alternative. As we have noted, while the state's interest in potential life is recognized, it cannot, under present law, be regarded as such a compelling interest as to overcome the constitutionally protected right of the mother. By denying funding for medically neces-

sary abortions, the Commonwealth has attempted to elevate the right of potential life over the health of the mother. This it may not do. By singling out persons who have need of a medically necessary abortion from all other persons entitled to general medically necessary services, the Commonwealth has allocated benefits on criteria which discriminatorily burden the exercise of an indigent pregnant woman's fundamental constitutional right. This it may not do.

Fully recognizing the heavy burden upon Petitioners to overcome the presumed constitutional validity of the statutes before us, we nevertheless conclude that that burden has been met in the instant case.

Although we have now decided that the statutes before us do offend the equal protection clauses of our state constitution, we deem it necessary to briefly consider the constitutional challenge based upon Pennsylvania's Equal Rights Amendment (ERA), because we believe that on appellate review it may be helpful for the reviewing court to have our opinion with respect to each of the constitutional challenges before us.

Our Supreme Court has categorically stated that the purpose of the ERA is to eliminate sex as a "classifying tool." *Snider v. Thornburgh,* 496 Pa. 159, 176, 436 A.2d 593, 601 (1981).

Petitioners contend, of course, that the statutes now before us do make a discriminatory distinction based solely upon sex. The Commonwealth is equally insistent that statutes based upon the unique physical characteristics of one sex do not constitute sex discrimination under the ERA. The Commonwealth relies upon case law such as *Geduldig v. Aiello,* 417 U.S. 484 (1974) which holds that where legislation related to pregnancies is involved, the classification is not between men and women but between pregnant women and non-pregnant persons and, therefore, is not gender-based.

We believe Pennsylvania case law is to the contrary. In *Anderson v. Upper Bucks County Area Vocational Technical School,* 30 Pa. Commonwealth Ct. 103, 110, 373 A.2d 126, 130 (1977), this Court held that ''since pregnancy is unique to women, a disability plan which expressly denies benefits for disability arising out of pregnancy is one which discriminates against women employes because of their sex.'' In *Cerra v. East Stroudsburg Area School District,* 450 Pa. 207, 213, 299 A.2d 277, 280 (1973), our Supreme Court held that a discharge from employment because of a physical condition peculiar to women, *i.e.* pregnancy, is ''sex discrimination pure and simple.'' Again, in *Henderson v. Henderson,* 458 Pa. 97, 101, 327 A.2d 60, 62 (1974), our Supreme Court held that our law ''will not impose different benefits or different burdens upon the members of a society based on the fact that they may be man or woman.''

Further, as this Court has noted, our Supreme Court has recognized that the ERA ''is not confined to the matter of individual 'rights' in the sense of entitlements, but equally extends to elimination of discrimination with respect to burdens and obligations 'under the law.' '' *Hartford Accident and Indemnity Co. v. Insurance Commissioner,* 65 Pa. Commonwealth Ct. 249, 255, 442 A.2d 382, 385 (1982). Thus, while the Pennsylvania courts are willing to discuss the possible justifications for discrimination, they have, at the same time, given weight to the unqualified language of the ERA.

The Commonwealth argues to us that the indigent women in need of medically necessary abortions would be in equally bad circumstances if there were no Medical Assistance program. That argument misses the mark. There *is* a Medical Assistance program and once the legislature has decided to grant financial assistance to the medically needy, it cannot exclude per-

sons from that grant on the basis of sex. In *Commonwealth v. Pennsylvania Interscholastic Athletic Association*, 18 Pa. Commonwealth Ct. 45, 334 A.2d 839 (1975), this Court sustained a constitutional challenge brought under the ERA to rule-making by the Pennsylvania Interscholastic Athletic Association, which we held to be state action, which would have prohibited girls from competing against boys in interscholastic sports. Judge BLATT wrote for the majority, that "[t]here is no fundamental right to engage in interscholastic sports, but once the state decides to permit such participation, it must do so on a basis which does not discriminate in violation of the constitution." *Id.* at 51, 334 A.2d at 842.

We are of the opinion that while Petitioners' argument under the ERA is not as strong as their equal protection argument, it is meritorious and sufficient in and of itself to invalidate the statutes before us in that those statutes do unlawfully discriminate against women with respect to a physical condition unique to women.

In summary we hold that the state may not constitutionally deny Medical Assistance funds to indigent pregnant women who seek medically necessary abortions.

3. Constitutionality of statutory language limiting funding for abortions for indigent females who are victims of rape or incest to those who have complied with the reporting requirement of the statutes

The Act of 1980 excepted from the general provisions of the statute which would prohibit Medical Assistance funding for abortions, those victims of rape or incest who "promptly" reported the crimes to a law enforcement agency or public health service. Regulations were subsequently adopted by the Depart-

ment of Public Welfare setting the time for such reporting in the case of rape at 72 hours from the time of the occurrence and in the case of incest, 72 hours from the time the victim was advised that she was pregnant.[16] The Act of 1982 includes those same specific time limits within the language of the statute itself but adds, in the case of incest, that the victim must within the same time limit name the other party to the incestuous act. In addition, the Act of 1982 does not give the rape victim the option of reporting to either a law enforcement agency or public health service. The rape victim must report to a law enforcement agency.

It is stipulated as fact that rape and incest are intensely personal invasions into the victim's privacy. Both our federal and state constitutions have been interpreted as protecting an individual's right of privacy. *Roe v. Wade; In re June 1979 Allegheny County Investigating Grand Jury*, 490 Pa. 143, 415 A.2d 73 (1980). This right of privacy is a fundamental one, older than the Bill of Rights. *In re B*, 482 Pa. 471, 394 A.2d 419 (1978). It protects the privacy of intimate relationships like those existing in the family, marriage, motherhood, procreation and child rearing. *Paris Adult Theater I v. Slaton*, 413 U.S. 49 (1973); *In re B*. In some respects, the federal and state constitutional protection of this valuable right are parallel; in others, the state protection is even more specific. *In re B*.

In the case *sub judice*, the testimony and admitted facts reveal that the right to privacy of victims of rape and incest would be violated by a 72 hour reporting requirement as a condition to be satisfied before such persons would be eligible for abortions funded by Medical Assistance. The "rape trauma syndrome"

---

[16] 11 Pa. B. 657 (1981).

includes among its many symptoms guilt and shame which make it virtually impossible for many rape victims to express themselves completely. In fact, some victims suffer unconsciousness and total amnesia after the incident occurs. The trauma may last from a few days to several weeks. In many counties of Pennsylvania, the report of a rape involves a pelvic examination, a polygraph test and a detailed statement of exactly what occurred. In some counties, this information must be communicated to persons not sensitized to the reality of the victim's trauma; moreover, there are no limitations on the use of reports made to the police or health officials and such reports are treated with varying degrees of confidentiality in the various counties of the Commonwealth.

For incest victims, the impact upon the personal lives of the victims is even more traumatic because, in most cases, the victims are children. To require females of tender age not only to report a pregnancy, but to identify the perpetrator of the crime as well, infringes upon that victim's fundamental right to privacy in a most damaging manner. Identifying another family member as a criminal within 72 hours of learning that she is pregnant is a terrifying experience too formidable for an adult, let alone one of tender years.

It seems apparent to us that the reporting requirement of the statutes now before us does violate the right of privacy guaranteed by both our federal and state constitutions.

While the Commonwealth cannot seriously contest our conclusion in this regard, it does strenuously argue that the state interests justify state intrusion into the constitutionally protected area of the victim's personal lives. Those interests are: prosecuting and convicting those who offend the criminal law; maximizing federal funding; promoting "fresh complaints" by rape victims; the need to report crime in order to pre-

vent subsequent crime; and the legislative desire to pay only for valid claims.

Our Supreme Court has recently spoken to the right of privacy based upon Article I, §1 of the Pennsylvania Constitution. In *Denoncourt v. State Ethics Commission,* Pa. , A.2d (No. 22 M.D. 1983, filed December 30, 1983) the Court reaffirmed a two-pronged analysis of the right to privacy as involving (1) a freedom from disclosure of personal matters and (2) the freedom to make certain important decisions. The Court held that determining whether the state's intrusion into an individual's privacy was permissible involved a balancing of the individual's right to privacy against the countervailing state interest. This interest must be significant, and there must be no alternate reasonable method of achieving the state interest with lesser intrusiveness. Determining whether the state interest is significant involves an inquiry as to whether the state's intrusion will effect its purpose. If it does not, the state intrusion is gratuitous, not purposeful.

Applying the principles enunciated in *Denoncourt,* we believe that it is clear that the reporting requirement of the statutes under review does involve the disclosure of personal matters and does infringe upon the individual's right to make important decisions. We further conclude that the state's intrusion here will not effect its purposes. The uncontested facts indicate that the reporting requirement will not increase the probable veracity of the claim that a crime has been committed nor will it motivate those victims who are physically or psychologically damaged by the event to make a fresh complaint when the aftereffects of the event render them incapable of doing so. There is no evidence in this case that women victims will make false rape or incest claims in order to obtain abortion funding. In this regard, it is interesting to

note that other enactments of our state legislature are to the effect that "fresh complaint" is no longer a factor in prosecuting those accused of rape, Section 3105 of the Crimes Code, 18 Pa. C. S. §3105, and that the statute of limitations for rape and incest prosecutions was extended, less than two years ago, to five years. Section 5552 of the Judicial Code, 42 Pa. C. S. §5552.[17] While it is true that federal funds would be available to fund abortions where the victims have conformed with the reporting requirements of the Hyde Amendment, the fact remains that rape is the most underreported crime in the country and underreporting of incest makes it impossible to determine how prevalent that crime is. The uncontradicted evidence is that the possible forfeiture of abortion funding will not promote prompt reporting. Whatever financial benefit would accrue to the state by virtue of the 72 hour reporting requirement would be minimal and that benefit standing alone, would not in our opinion, be a sufficient state interest to warrant intrusion into the victim's right to privacy.

In addition, we remain unconvinced that there are not reasonable alternatives to the 72 hour limitation which would be less intrusive. For example, a report within the first trimester of pregnancy, a limitation used in *Roe v. Wade,* would seem to be reasonable and sufficient to effect the state's purpose. The identifi-

---

[17] The fact that the legislature also has provided in the Act of April 9, 1929, P.L. 177, *as amended,* 71 P.S. §180-7.9 that crimes must be reported within 72 hours to enable claimants to obtain compensation from the Crime Victim's Compensation Board cannot be used effectively to support an argument of uniformity because the crimes of rape and incest are inherently unique. The fact that the most recent Hyde Amendment also mandates a 72 hour reporting requirement cannot validate a Pennsylvania statute if that statute is unconstitutional in light of the protections afforded by our state constitution.

cation of the perpetrator in incest cases cannot, in the opinion of this Court, be justified under any criteria.

In short, we cannot accept the Commonwealth's contention that the state interests in mandating 72 hour reporting by rape and incest victims is so compelling that it overrides the obvious and injurious invasion of the victim's right to privacy.

While Petitioners urge upon us that if the reporting requirement of the Act of 1982 is unconstitutional, the entire Act is thereby rendered unconstitutional, we must reject that argument. The provisions of Section 1925 of the Statutory Construction Act of 1972, 1 Pa. C. S. §1925 are clearly applicable here. Although the Act of 1982 contains no severance clause, Section 1925 makes it unnecessary for such a provision to be included. There is no doubt in our mind that the remaining provisions of the Act of 1982 are complete and capable of being executed in accordance with the legislature's intent notwithstanding the unconstitutionality of Section 3215(c).

### Conclusions of Law

1. Section 453 of the Public Welfare Code, Act of June 13, 1967, P.L. 31, *as amended,* added by Section 1 of the Act of December 19, 1980, P.L. 1321, 62 P.S. §453 is unconstitutional because it offends the equal protection provisions of the Constitution of Pennsylvania.

2. Section 3215(c) of the Abortion Control Act, 18 Pa. C. S. §3215(c) is unconstitutional because it offends the equal protection provisions of the Constitution of Pennsylvania.

3. Section 453 of the Public Welfare Code, Act of June 13, 1967, P.L. 31, *as amended,* added by Section 1 of the Act of December 19, 1980, P.L. 1321, 62 P.S. §453 is unconstitutional because it violates the provisions of Article I, Section 28 of the Constitution of Pennsylvania.

4. Section 3215(c) of the Abortion Control Act, 18 Pa. C. S. §3215(c) is unconstitutional because it violates the provisions of Article I, Section 28 of the Constitution of Pennsylvania.

5. Section 3215(c) of the Abortion Control Act, is unconstitutional because it violates the right to privacy guaranteed to victims of rape and incest by the state and federal constitutions.

DECREE NISI

It is ordered, adjudged and decreed that the provisions of Section 453 of the Public Welfare Code, Act of June 13, 1967, P.L. 31, *as amended,* added by Section 1 of the Act of December 19, 1980, P.L. 1321, 62 P.S. §453 and Section 3215(c) of the Abortion Control Act, 18 Pa. C. S. §3215(c) are invalid because they violate the rights of the Petitioners guaranteed by the Constitutions of the Commonwealth of Pennsylvania and the United States.

The Respondents are permanently enjoined from enforcing the provisions of the aforesaid statutes.

Unless exceptions are filed within 10 days of the date hereof, this decree nisi shall be entered as a final decree by the Chief Clerk upon praecipe of either party.