JoAnne Fischer et al., Petitioners *v.* Commonwealth of Pennsylvania, Department of Public Welfare et al., Respondents.

Argued May 1, 1984, before President Judge CRUMLISH, JR. and Judges WILLIAMS, JR., CRAIG, MAC-PHAIL, DOYLE, BARRY and COLINS.

*Kathryn Kolbert,* with her, *Susan Cary Nicholas, Seth Kreimer* and *Robert F. Williams,* for petitioners.

*Andrew S. Gordon,* Senior Deputy Attorney General, with him, *Daniel R. Schuckers,* Deputy Attorney General, *Allen C. Warshaw,* Senior Deputy Attorney General, Chief, Litigation Section, *LeRoy S. Zimmerman,* Attorney General, and *Stanley Slipakoff,* Assistant Counsel, Department of Public Welfare, for respondents.

*Nadine Taub,* with her, *Pamela Pryor Cohen, Swenson and Cohen,* for Amici Curiae of the National Women's Health Network et al.

*William Bentley Ball,* with him, *Philip J. Murren* and *Sandra E. Wise, Ball & Skelly,* for Amici Curiae, Dr. Dorothy Czarnecki et al.

Opinion by President Judge Crumlish, Jr., September 20, 1984:

Before us are petitioners' and respondents' exceptions to the decree nisi[1] of Judge John A. MacPhail, dated March 9, 1984, sitting as Chancellor. Petition-

---

[1] *Fischer v. Department of Public Welfare,* 85 Pa. Commonwealth Ct. 215, 482 A.2d 1137 (1984).

ers, a group of named individuals and a clergyman suing on their own behalf as well as all others similarly situated, a physician, and several non-profit medical service organizations, filed a petition for review seeking declaratory and injunctive relief which would prohibit the Commonwealth Respondents[2] (hereinafter Commonwealth) from implementing Section 453 of the Public Welfare Code[3] entitled "Expenditure of public funds for abortions limited," and Section 3215(c) of the Abortion Control Act[4] (the 1982 Abortion Control Act) also dealing with the public funding of abortion.

## HISTORY

In August of 1981, petitioners' motion for preliminary injunction was granted and later affirmed by our state Supreme Court. *Fischer v. Department of Public Welfare*, 497 Pa. 267, 439 A.2d 1172 (1982).[5] In March of 1984, Judge MACPHAIL, acting as Chancellor, and after trial, made findings of fact and conclusions of law and issued a decree nisi declaring unconstitu-

[2] The respondents in this controversy are the Governor, the Department of Public Welfare, the Secretary of Public Welfare, and the Deputy Secretary for Medical Assistance of the Pennsylvania Department of Public Welfare.

[3] Section 453 of the Public Welfare Code (Code), Act of June 13, 1967, P.L. 31, *as amended*, added by Section 9 of the Act of December 19, 1980, P.L. 1321, 62 P.S. §453. While the case was in the pleading stage, the Pennsylvania General Assembly enacted the 1982 Abortion Control Act, 18 Pa. C. S. §3201-3220.

[4] 18 Pa. C. S. §3215(c). Section 453 of the Code and Section 3215(c) of the Abortion Control Act are substantially the same. Hereinafter, they will either be referred to individually by name or collectively as "the funding statutes."

[5] Respondents' preliminary objections were overruled by an equally-divided Commonwealth Court in June of 1982. *See Fischer v. Department of Public Welfare*, 66 Pa. Commonwealth Ct. 70, 444 A.2d 774 (1982). The Pennsylvania Supreme Court declined to accept review of that interlocutory order.

tional[6] and prohibiting the enforcement of Section 453 of the Public Welfare Code and Section 3215(c) of the 1982 Abortion Control Act. Petitioners and respondents timely filed exceptions to the decree. For the reasons to follow, we sustain respondents' exceptions which are based on article III, section 32 of the Pennsylvania Constitution, the Commonwealth's equal protection clause, and article I, section 28 of the Pennsylvania Constitution, the Commonwealth's equal rights amendment (ERA), and overrule the remainder of their exceptions.[7] We overrule petitioners' exceptions.

A version of the 1982 Abortion Control Act was first enacted in 1974 (the 1974 Abortion Control Act), and its general funding section[8] read as follows:

Since it is the public policy of the Commonwealth not to use public funds to pay for unneeded and unnecessary abortions, no abortion shall be subsidized by any State or local governmental agency in the absence of a certificate of a physician, filed with such body, stating that such abortion is necessary in order to preserve the life or health of the mother.

---

[6] Section 453 of the Public Welfare Code was found to violate the equal protection provisions of the Pennsylvania Constitution, article I, sections 1 and 26, and article III, section 32, and the so-called equal rights amendment of the Pennsylvania Constitution, article I, section 28.

Section 3215(c) of the 1982 Abortion Control Act was found to violate those constitutional provisions transgressed by Section 453 and the right to privacy guaranteed by article I, section 1 and article III, section 32 of the Pennsylvania Constitution and the first, fourth, fifth, ninth and fourteenth amendments to the United States Constitution.

[7] Since we agree with the respondents' argument that the Chancellor improperly decided the equal protection and equal rights claims, we need not singularly address every exception.

[8] Section 7 of the Abortion Control Act, Act of September 10, 1974, P.L. 639, as amended, 35 P.S. §6607.

Nothing contained in this section shall be interpreted to restrict or limit in any way, appropriations, made by the Commonwealth or a local governmental agency to hospitals for their maintenance and operation, or, for reimbursement to hospitals for services performed.

However, in 1975, this section, and much of the 1974 Abortion Control Act, were held invalid in *Planned Parenthood Association v. Fitzpatrick*, 401 F. Supp. 554 (E.D. Pa. 1975). There, the District Court for the Eastern District of Pennsylvania considered the constitutionality of the 1974 Act and held, *inter alia,* that Section 7, the general funding section, conflicted with Title XIX of the Social Security Act[9] and concluded that it violated the equal protection clause of the fourteenth amendment. Judge CLIFFORD SCOTT GREEN, writing for a panel of three, held that the state's denial of subsidies for unnecessary abortions was inconsistent with the Supreme Court's decision in *Roe v. Wade*, 410 U.S. 113 (1973), since it denied indigent pregnant women financial aid. *Fitzpatrick,* 401 F. Supp. at 581.

In an effort to revive the legislation following *Fitzpatrick,* the Pennsylvania General Assembly, in 1978, amended the 1974 Abortion Control Act. In particular, the broad language of the funding provision of the 1974 Act was replaced with language similar to that found in the so-called "Hyde Amendment."[10] The, by now well-known, Hyde Amendment prohibited the use

---

[9] Social Security Act, §§1901-1917, *as amended*, 42 U.S.C. §§1396-1396P.

[10] The funding sections of the Abortion Control Act have resembled the so-called Hyde Amendments. These are riders to the Department of Labor and Health and Human Service (formerly the Health, Education and Welfare) annual appropriations bills, named after the original sponsor Rep. Henry Hyde (R.—Ill.). Since September 1976 Congress has restricted the use of federal medicaid funds to subsidize abortions via the Hyde Amendments.

of federal funds for reimbursement of the costs of abortions under the federal medicaid program unless such procedure were deemed necessary to save the life or preserve the health of the mother. Significantly, it pronounced as public policy the preference for childbirth over abortion.

However, as was the case of the earlier version in *Fitzpatrick,* this amended section was enjoined in 1980

The original amendment restricted use of federal medicaid funds to subsidize abortions where "the life of the mother would be endangered if the fetus were carried to term." P.L. No. 94-439, §209, 90 Stat. 1434 (1976). Until fiscal year 1978, its enforcement was enjoined due to a nationwide injunction set forth in *McRae v. Matthews,* 421 F. Supp. 533 (E.D. N.Y. 1976), *vacated and remanded sub nom., Califano v. McRae,* 433 U.S. 916 (1977). After exhaustive debates in 1977, a broader version of the Hyde Amendment was adopted. In addition to the original language, the rider allowed abortions for promptly reported cases of rape and incest or in "instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians." P.L. No. 94-205, §101, 91 Stat. 1460 (1977). The 1978 Amendment was identical. P.L. 95-480, §120, 92 Stat. 1586 (1978). In 1979, the 1980 fiscal year, the category relating to the mother's physical health damage was deleted from the Amendment. P.L. No. 96-123, §109, 93 Stat. 926 (1979). In 1980, the Hyde rider was amended again and read that all funds for abortions are prohibited "except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims or [sic] rape or incest when such rape has been reported within seventy-two hours to a law enforcement agency or public health service; nor are payments prohibited for drugs or devices to prevent implantation of the fertilized ovum, or for medical procedures necessary for the termination of an ectopic pregnancy." P.L. No. 96-536, §109, 94 Stat. 3170 (1980). The appropriation amendment for the 97th Congress, 1st Session, 1981, saw a return to the original most restrictive version proscribing abortion. P.L. No. 97-12, §402, 95 Stat. 95 (1981). For 1982 and the current year, the same limited provision was enacted, "None of the funds provided by this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term." P.L. No. 97-377, §402, 96 Stat. 1894 (1982) ; P.L. No. 98-139, §204, 97 Stat. 887 (1983).

by the Third Circuit Court of Appeal in *Roe v. Casey,* 623 F.2d 829 (3d Cir. 1980). Judge GARTH, writing for the Third Circuit, found that the amendment was, as modified by the Hyde Amendment, at odds with Title XIX of the Social Security Act.[11]

Undaunted by the result of the previous litigation, the General Assembly, in December of 1980, amended the Public Welfare Code to limit medicaid funding of abortion. Section 453 of the Code, entitled "Expenditure of public funds for abortions limited," provided:

> Since it is the public policy of the Commonwealth to favor childbirth over abortion, no Commonwealth funds and no Federal funds which are appropriated by the Commonwealth shall be expended by any State or local government agency for the performance of abortion: Provided, That nothing in this act shall be construed to deny the use of funds where a physician has certified in writing that the life of the mother would be endangered if the fetus were carried to full term or except for such medical procedures necessary for the victims of rape or incest when such rape or incest has been reported promptly to a law enforcement agency or public health service. Nothing contained in this section shall be interpreted to restrict or limit in any way, appropriations, made by the Commonwealth or a local governmental agency to hospitals for their maintenance and operation, or, for reimbursement to hospitals for services rendered which are not for the performance of abortions.[12]

---

[11] Title XIX is also referred to as the "medicaid act" in *Casey.*

[12] The Department of Public Welfare promulgated regulations in 11 Pa. B 657 (1981), which defined prompt reporting in the case of rape as that which must be done within 72 hours of the occurrence of the rape and, in the case of incest, that which must be done

Subsequent to the enactment of the latter amendment[13] to the Public Welfare Code, petitioners filed this action seeking to have Section 453 declared unconstitutional.

In June of 1982, in the midst of the pleading stage of the original petition for review, Governor Thornburgh signed into law the 1982 Abortion Control Act[14] In response to the funding provisions of the 1982 Act,[15] petitioners filed an amended petition for review

within 72 hours from the time the victim was advised she was pregnant.

[13] In mid-December 1981, the Pennsylvania General Assembly passed Senate Bill 742 (SB 742). This bill originated in the Senate as a bill to outlaw "tough guy" competitions (physical contact bouts between amateurs). Lengthy debates occurred on the House floor as to the amendment's germaneness since it was attached to this unrelated bill, but it was passed 114-81. The Senate concurred; however, Governor Dick Thornburgh vetoed the bill on December 23, 1981. The Governor expressed a concern of placing an unconstitutional burden on obtaining an abortion as the U.S. Supreme Court determined a woman was entitled to do. Furthermore, Governor Thornburgh stated,

> I am also concerned that in its entirety the bill in its current form goes further than is necessary in protecting the state interests in this area to which I have referred. In so doing, it threatens to create additional regulation and bureaucracy and to unduly involve government in the private lives of its citizens.

Veto Message to the Senate (Dec. 23, 1981), History of Senate Bills V-2, V-4 (1981-1982).

In the early months of 1982, a cooperative effort between the Governor's Office and the General Assembly produced a compromise bill, Senate Bill 439. This bill originated as one regulating paramilitary training with the Abortion Control Act as an amendment. This bill was passed and signed by the Governor on June 11, 1982.

[14] 18 Pa. C. S. §§3201-20. This act was to become effective on December 8, 1982.

[15] On May 31, 1984, Circuit Judge SLOVITER of the United States Court of Appeals for the Third Circuit struck down most of the provisions of the 1982 Abortion Control Act determining them to be unconstitutional as a matter of law. *American College of Obste-*

seeking review of Section 3215(c) of the 1982 Abortion Control Act pertaining to the public funding of abortions, which provides in part:

(c) Public funds. — No Commonwealth funds and no Federal funds which are appropriated by the Commonwealth shall be expended by any State or local government agency for the performance of abortion, except:

(1) When abortion is necessary to avert the death of the mother on certification by a physician. When such physician will perform the abortion or has a pecuniary or proprietary interest in the abortion there shall be a separate certification from a physician who has no such interest.

(2) When abortion is performed in the case of pregnancy caused by rape which has been reported within 72 hours of the rape to a law enforcement agency having the requisite jurisdiction and has been personally reported by the victim or her agent.

(3) When abortion is performed in the case of pregnancy caused by incest which has been reported within 72 hours from the date when the female first learns she is pregnant and she has named the other party to the incestuous act. Such information shall be turned over by the department to a law enforcement agency.

We are, of course, not unmindful of the very deep and devisive ancillary issues which accompany this controversy.[16] While diverse cogent, moral, philo-

_tricians and Gynecologists, Pennsylvania Section v. Thornburgh_, 737 F.2d 283 (3d Cir. 1984). However, the issue of state funding of abortions was not raised before the Third Circuit. _Id._ at 289 n. 5.

[16] We echo Judge MACPHAIL's sentiments in our admiration and appreciation for counsels' professionalism and courtesy in this very

sophical and legal arguments have been orchestrated to a crescendo, our expressions are impervious to the dinning public rhetoric which has been extensively and unremittingly directed to our attention. Rather than grapple with the moral, philosophical and legal arguments to exclude from its parameters what this case is not about,[17] we need only turn to Judge DAVID CRAIG's thoughts when he overruled the Commonwealth's preliminary objections:

[T]he ultimate principal issue here is whether a state law may withhold financial aid for a medical abortion needed to preserve the health of an indigent woman and allow it only if her very life is endangered, while not applying any similar limitation to other medical procedures necessary for health preservation alone—recognizing also that the nonindigent woman faces no such distinction.

*Fischer v. Department of Public Welfare,* 66 Pa. Commonwealth Ct. 70, 82, 444 A.2d 774, 780 (1982).

DISCUSSION

*Equal Protection*

After analyzing the funding statutes, the Chancellor concluded "that the funding restriction imposes an undue burden upon the fundamental right of indigent women to have a medically necessary abortion."[18] The Chancellor reasoned that *Roe v. Wade,* 410 U.S. 113

---

complicated and emotional matter. Let counsels' conduct, filings and oral presentations stand as a paradigm to those seeking guidance for professional standards.

[17] This case does *not* involve the issue of legality or morality of abortion. The constitutional status of that issue has been resolved. *See Roe v. Wade,* 410 U.S. 113 (1973).

[18] *Fischer v. Department of Public Welfare,* 85 Pa. Commonwealth Ct. 215, 482 A.2d 1137 (1984).

(1973), recognized the right of a woman to terminate her pregnancy and that constitutionally-protected right, though not absolute, is fundamental and can be impeded only when the interest of the state is a compelling one. While the state's interest in the potentiality of life is a recognizable one, it could not, as the Chancellor viewed present law, be regarded as so compelling an interest as to supersede a pregnant woman's constitutionally-protected right of self-determination. When the Chancellor balanced the two not always compatible and at times competing interests in *Roe v. Wade, i.e.,* the health of the mother and the potential for human life, he found the present funding scheme to impinge upon the mother's fundamental right:

> By denying funding for medically necessary abortions, the Commonwealth has attempted to elevate the right of potential life over the health of the mother. This it may not do. By singling out persons who have need of a medically necessary abortion from all other persons entitled to generally medically necessary services, the Commonwealth has allocated benefits on criteria which discriminatorily burden the exercise of an indigent pregnant woman's fundamental constitutional right. This it may not do.[19]

We must respectfully disagree with that analysis. Decisions of the United States Supreme Court are not always binding authority on us but can and often do serve as helpful guiding principles. *See Kroger Co. v. O'Hara Township,* 481 Pa. 101, 392 A.2d 266 (1978). The Chancellor considered but did not follow the abortion funding decisions of the United States Supreme Court in *Harris v. McRae,* 448 U.S. 297 (1980), and *Maher v. Roe,* 432 U.S. 464 (1977).

---

19 *Id.* at 231-32, 482 A.2d at 1144.

In *Maher,* the Supreme Court was faced with the task of determining whether restrictions upon state aid for non-therapeutic abortions[20] impermissibly infringed upon the rights of privacy and freedom of choice recognized in *Roe v. Wade.* The *Maher* Court upheld the state welfare regulation. In *Harris,* the Supreme Court upheld the federal Medicaid Act and Hyde Amendment thereto which restricted the use of federal funds for reimbursement of the cost of abortion under the Medicaid program to those situations where the life of the mother would be endangered if the fetus were carried to term or where the mother was the victim of rape or incest. In either case, those incidents had to be promptly reported to the proper authorities.

While we recognize that we are at liberty to consider the merits of a state-based constitutional challenge independently of the United States Supreme Court, *see Danson v. Casey,* 33 Pa. Commonwealth Ct. 614, 382 A.2d 1238 (1978), *aff'd,* 484 Pa. 415, 399 A.2d 399 (1979), we are convinced, as we read the language of this Commonwealth's Constitution, of the correctness and applicability of the rationale expressed in *Harris* and *Maher* that this legislation does not violate the equal protection provision of the Pennsylvania Constitution.

The right enunciated in *Roe v. Wade* is a qualified one. There, it was held that state regulation of abortion in certain instances may be appropriate. The Court said, "[A] state may properly assert important interests in safeguarding health, in maintaining medical standards, and in protecting potential life. At some point in pregnancy, these respective interests become sufficiently compelling to sustain regulation of

---

[20] A nontherapeutic abortion is one induced at the request of the woman or her doctor.

the factors that govern the abortion decision." *Roe v. Wade,* 410 U.S. at 154.[21]

A woman is protected from unduly burdensome interference with her freedom to terminate a pregnancy but, conversely, this prohibition against the placement of direct governmental barriers does not prohibit state legislation which encourages childbirth over abortion. A state is free "to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds." *Maher v. Roe,* 432 U.S. at 474.

In *Maher* and *Harris,* the Supreme Court pointedly distinguished the privacy or self-determination right in *Roe v. Wade* from the public funding of the exercise of that right. In *Maher,* the Supreme Court looked at a Connecticut welfare regulation which provided benefits for medical services incident to childbirth but denied those benefits which were related to non-therapeutic abortions. The Court, in upholding the Connecticut regulation, distinguished between *forbidden coercion* and *permissible incentive.* "There is a basic difference between direct state interference with a protected activity and state encouragement of an *alternative activity consonant with legislative policy." Id.* at 475 (emphasis added).

The *Maher* Court observed that the case involved neither discrimination against a suspect class nor an impingement upon a fundamental right explicitly or

---

[21] The Court held that during the first trimester the abortion decision and its effectuation must be left to the medical judgment of the woman's physician. During the second trimester, the state, in promoting its interest in the health of the mother, may regulate the abortion procedure in ways that are reasonably related to maternal health. During the last trimester, the state, in promoting its interest in the potentiality of human life, may regulate or even proscribe abortion except where it is necessary for the preservation of the life or health of the mother. *Roe v. Wade,* 410 U.S. at 165.

implicitly protected by the Constitution. Relying on *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973), the Court noted that financial need in itself does not identify a suspect class for the purposes of the equal protection argument. The *Maher* Court asserted:

> The . . . regulation places no obstacles— absolute or otherwise—in the pregnant woman's path to an abortion. An indigent woman who desires an abortion suffers no disadvantage as a consequence of Connecticut's decision to fund childbirth; she continues as before to be dependent on private sources for the services she desires. *The State may have made childbirth a more attractive alternative, thereby influencing the woman's decision, but it has imposed no restriction on access to abortions that was not already there.* The indigency that may make it difficult—and in some cases, perhaps impossible—for some women to have abortions is neither created nor in any way affected by the Connecticut regulation. (Emphasis added.)

*Maher v. Roe*, 432 U.S. at 474.

In *Harris*, the forbidden coercion and permissible incentive distinction proved dispositive. There, the Court was faced with the constitutionality of the 1980 fiscal year Hyde Amendment.[22] That Amendment provided:

> [N]one of the funds provided by this joint resolution shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest when such rape or

---

[22] Pub. L. 96-123, §109, 93 Stat. 926. This version of the Hyde Amendment for the fiscal year 1980 is very similar to the statute in the case *sub judice*. See n. 10, *supra*.

incest has been reported promptly to a law enforcement agency or public health service.

The Hyde Amendment was found to place no governmental obstacle in the path of a woman choosing to terminate her pregnancy. "[The] protection against unwarranted government interference with freedom of choice . . . does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom." *Harris,* 448 U.S. at 317-18. As in *Maher,* the regulation was construed to provide a means to encourage alternative activity through subsidization. The alternative activity (childbirth) was preferred because of established public policy favoring it. *Harris,* 448 U.S. at 315.

To consider whether the funding statute here in question denies petitioners' equal protection of the laws,[23] we must determine the appropriate standard of review. There are two tests which have surfaced in the evolution of this theory of constitutional interpretation—rational basis and strict scrutiny. "If the statutory classification bears some rational relationship to a legitimate state end, it is within the legislative power." *Martin v. Unemployment Compensation Board of Review,* 502 Pa. 282, 291, 466 A.2d 107, 111 (1983). If the statute burdens a suspect class or impinges upon one's exercise of a fundamental right, the Court will strictly scrutinize the statute and the state is obliged to proffer compelling reasons for its classification. *See McCoy v. State Board of Medical Education and Licensure,* 37 Pa. Commonwealth Ct. 530, 540, 391 A.2d 723, 728 (1978).

---

[23] Although the equal protection clause of the United States Constitution and article III, section 32, of the Pennsylvania Constitution vary in content, their substantive application is not significantly different insofar as traditional equal protection is concerned. *Danson v. Casey,* 33 Pa. Commonwealth Ct. 614, 626, 382 A.2d 1238, 1244 (1978).

Judge MACPHAIL's analysis of the infirmity of the present legislation led him to the conclusion that, because a woman has a right to an abortion in certain circumstances under *Roe v. Wade,* then necessarily, if she is indigent, the state has the obligation to fund this right. Thus, the right to a funded abortion would be present even if the state chose not to fund childbirth. His erroneous determinant is indigency. We disagree with the Chancellor, for *Roe v. Wade* does not reach the end perceived by him. A woman's freedom of choice does not carry with it a constitutional entitlement to every financial resource with which to avail herself of the full range of protected choices. *See Harris v. McRae,* 448 U.S. at 317-18. For example, a citizen has a constitutional right to travel but is not entitled to travel at the public expense. One has a constitutional right to freedom of expression but is not entitled to the use of public funds to finance the expounding of personal views. The economic constraints on the woman who would terminate her pregnancy are not caused by the Commonwealth. Her financial problems exist and continue to exist whether she elects to choose one or the other alternative. These problems are not the consequence of any action or legislation on the part of the Commonwealth.

We are convinced that the funding statutes do not impinge upon a fundamental right. Section 3202 of the 1982 Abortion Control Act[24] states in part, "It is the intention of the General Assembly of the Commonwealth of Pennsylvania to protect hereby the life and health of the woman subject to abortion and to protect the life and health of the child subject to abortion." Section 443 of the Public Welfare Code provides in part: "[I]t is the public policy of the Commonwealth to favor childbirth over abortion." We

---

[24] 18 Pa. C. S. §3202.

conclude that the Commonwealth is offering a legitimate permissible incentive and is not dictating a coercive course. The Commonwealth is simply offering an alternative.

We further hold that this legislation is not predicated upon a suspect classification. The *Maher* Court observed that "every denial of welfare to an indigent creates a wealth classification as compared to non-indigents who are able to pay for the desired goods or services. But this Court has never held that financial need alone identifies a suspect class for purposes of equal protection." *Maher,* 432 U.S. at 471. It is well settled that discrimination based on the degree of comparative economic security alone does not give us the authority to invoke the strict scrutiny test. *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1 (1973). Our Supreme Court in *Martin* held that a classification based on wealth does not trigger a heightened standard of scrutiny.

Having concluded that there is no infringement upon fundamental rights or suspect classification, we must determine whether there is a reasonable basis for the legislation. *Houtz v. Department of Public Welfare,* 42 Pa. Commonwealth Ct. 406, 410, 401 A.2d 388, 391 (1979). Our Supreme Court in *Martin* adopted the standard of the United States Supreme Court in *Hodel v. Indiana,* 452 U.S. 314, 331-32 (1982), for scrutinizing social and economic legislation:

> Social and economic legislation . . . that does not employ suspect classifications or impinge on fundamental rights must be upheld against equal protection attack when the legislative means are rationally related to a legitimate governmental purpose. . . . Moreover, such legislation carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality. . . . [S]o-

cial and economic legislation is valid unless ''the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [a court] can only conclude that the legislature's actions were irrational.'' This is a heavy burden, and appellees have not carried it. (Citations omitted.)

*Martin,* 502 Pa. at 294, 466 A.2d at 113. This standard, strict as it may seem, is constitutionally-mandated so as to preserve the separation of powers, so basic to our system of government. *Id.* We hold that, through these funding statutes, the Commonwealth has reasonably furthered its interest in childbirth, recognized to be a vital governmental interest in *Roe v. Wade.*[25]

## Equal Rights Amendment

In addition to the equal protection clauses of the state constitution, petitioners argued a constitutional challenge based upon the Pennsylvania equal rights amendment (ERA)[26] that provides, ''Equality of rights under the law shall not be denied or abridged

---

[25] Petitioners seriously misconstrue the Commonwealth's position regarding the state's constitutional duties and responsibilities when allocating public benefits and the United States Supreme Court's holding in *Harris. See* petitioners' brief in opposition to respondents' motion for post-trial relief at p. 51. Nowhere in petitioners' briefs or argument can the Commonwealth's position be analogized to one where the state "could rationalize the exclusion of all women from participation in the food stamp program, or rule out all minority women from receiving low income energy assistance." *Id.* Nor has any attempt been made to have *Harris* stand for the proposition that "the state may freely allocate public benefits without constitutional limitation." *Id.* To the contrary, respondents state that "the state is not obligated to fund programs for the needy, but once it does, the distribution of that aid *is subject to* constitutional limitations." Respondents' brief in support of post-trial motions, p. 9 (emphasis added).

[26] Pa. Const. art. I, §28.

in the Commonwealth of Pennsylvania because of the sex of the individual.'' While acknowledging that petitioners' argument is not as strong as the equal protection argument, the Chancellor concluded that the funding statute unlawfully discriminates against women in respect to a physical condition which is unique to them. The cases of *Anderson v. Upper Bucks County Area Vocational Technical School*, 30 Pa. Commonwealth Ct. 103, 373 A.2d 126 (1977), and *Cerra v. East Stroudsburg Area School District*, 450 Pa. 207, 299 A.2d 277 (1973) (employment discrimination cases in which women were being adversely discriminated against because of pregnancy), were cited in support of this conclusion.

We easily distinguish *Anderson* and *Cerra*. In *Anderson*, a collective bargaining agreement excluded sick leave benefits for pregnancy. This Court held that this exclusion constituted sex discrimination[27] because we found that pregnancy, under the Pennsylvania Human Relations Act,[28] should be treated as any other infirmity. In *Cerra*, a tenured female teacher was fired for incompetency and willful misconduct when she refused to resign at the end of her fifth month of pregnancy in accord with a school district

---

[27] The *Anderson* Court did not follow the Supreme Court cases of *Geduldig v. Aiello*, 417 U.S. 484 (1974), and *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976). In *Aiello*, the Court held that exclusion of disability from pregnancy from the coverage of a state employment compensation disability insurance program does not amount to invidious discrimination under the equal protection clause, but that such an exclusion is a rationally supportable stopping point for benefits. In *Gilbert*, the Court held that the extension of such an exclusion to a private employer's disability plan is not in violation of Title VII of the Civil Rights Act. *Anderson* was a case of statutory interpretation, not constitutional interpretation, decided under Section 5(a) of the Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §955(a).

[28] 43 P.S. §§951-963.

regulation. Our Supreme Court held that, while incompetency may be a valid reason for termination, a physical disability which results "in a teacher's temporary absence . . . is not . . . incompetence." *Cerra*, 450 Pa. at 211, 299 A.2d at 279. In a statutory rather than constitutional analysis, it stated:

> Male teachers, who might be temporarily disabled from a multitude of illnesses, have not and will not be so harshly treated. In short, Mrs. Cerra and other pregnant women are singled out and placed in a class to their disadvantage. They are discharged from their employment on the basis of a physical condition peculiar to their sex. This is sex discrimination pure and simple.

*Id.* at 213, 299 A.2d at 280. These cases are not dispositive of the issue before us. In the case *sub judice*, *indigent women* who choose to carry a fetus to term receive certain benefits which *indigent women* who choose to terminate their pregnancy do not. This simply is not actionable sex discrimination under the provisions of ERA.

This case does not involve a gender-based classification cognizable under the equal rights amendment. True, this statute has a basis in gender, for only women may choose to have an abortion or bear a child. But women are not being unfairly discriminated against because of their sex. "The legislation is directed at abortion as a medical procedure, not at women as a class." *Moe v. Secretary of Administration*, 417 N.E. 2d 387, 407 (Mass. Sup. Jud. Ct. 1982) (HENNESSEY, C.J., dissenting). The Commonwealth has chosen to further a legitimate state interest through the use of its funding power. We hold that the funding sections of the Public Welfare Code and the 1982 Abortion Control Act do not violate the provisions of the Pennsylvania equal rights amendment.

*Reporting Requirement*

Section 453 of the Public Welfare Code and the Department's own regulations[29] require that a victim of rape report its occurrence within 72 hours to a law enforcement agency or a public health service to qualify for state funding of an abortion. Victims of incest must report to either a public authority or a public health service within 72 hours from the time the victim is advised of her pregnancy. Section 3215(c) of the Abortion Control Act, a more constrictive statute, provides that a victim of rape or her agent must report that rape to the law enforcement agency with proper jurisdiction within 72 hours of the rape's occurrence. A victim of incest must report such pregnancy within 72 hours of the victim's knowledge and name the incestuous partner. The information is then turned over by the Department of Public Welfare to a law enforcement agency.

We agree with the Chancellor that these provisions are unconstitutional in that they are so intrusive as to violate the right of privacy guaranteed under article I, section 1 of the Pennsylvania Constitution:

> All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

The right to privacy pronounced in article I, section 2 has been recognized by our Supreme Court in *In Re June 1979 Allegheny County Investigating Grand Jury*, 490 Pa. 143, 415 A.2d 73 (1980). There, the right of privacy was said to encompass: (1) a freedom from disclosure of personal matters and (2) the freedom to make certain important decisions. *Id.* at 150-51, 415

---

[29] 11 Pa. B. 657 (1981).

A.2d at 77. To determine whether an intrusion into an individual's privacy is permissible, the individual's right of privacy is balanced against the countervailing state interest. *Denoncourt v. State Ethics Commission,* Pa. , , 470 A.2d 945, 948 (1983). There, our Supreme Court stated:

> [the] government's intrusion into a person's private affair is constitutionally justified when the government interest is significant and there is no alternate reasonable method of lesser intrusiveness to accomplish the governmental purpose. Whether there is a significant state interest will depend, in part, on whether the state's intrusion will effect its purpose; for if the intrusion does not effect the state's purpose, it is a gratuitous intrusion, not a purposeful one. (Footnotes omitted.)

*Id.* at , 470 A.2d at 949.

It has been stipulated of record that rape and incest are intensely personal invasions into the victim's privacy. There is, of course, no dispute that both rape and incest are so personal and so traumatic as to want for comparatives. From our perspective, it appears that the only function served by the reporting requirement is to compound the original abuse. The Commonwealth attempts to justify the state intrusion into the victim's personal lives by claiming profound interest in the prosecution and conviction of those who offend the criminal law, the maximization of federal funding, the promotion of "fresh complaints" by rape victims, the need to report crime in order to prevent subsequent crime, and the legislative intention to pay only valid claims. We agree with the Chancellor's analysis of these interests and his conclusion that the intrusion will not effect the Commonwealth's purposes. The record discloses that the reporting requirements will

not increase the veracity of the claim nor will they motivate physically- or psychologically-damaged victims to make "fresh complaints."[30] There was no evidence that women will make false rape or incest claims merely to obtain the funding.

The right being invaded here is one of significant constitutional proportions. The statute requires disclosure of an intensely personal and traumatic experience when such a disclosure may very well be impossible due to physical or psychological injury. Justice LARSEN, in his dissent in *Matter of Pittsburgh Action Against Rape*, 494 Pa. 15, 38, 428 A.2d 126, 138 (1981), aptly noted:

> A rape victim suffers an invasion of her bodily privacy in an intensely personal and unsettling manner, triggering a number of emotional and psychological reactions running the gamut from shock, fear, distrust and anger to guilt, shame and disgust.

The "rape trauma syndrome" can bring about unconsciousness and amnesia in some victims, lasting for periods ranging from a few days to several weeks.

Incest is even more traumatic upon victims' personal lives because children are the usual victims.

> To require females of tender age not only to report a pregnancy, but to identify the perpetrator of the crime as well, infringes upon that victim's fundamental right to privacy in a most damaging manner. Identifying another family member as a criminal within 72 hours of learning that she is pregnant is a terrifying experi-

---

[30] "Fresh complaint" is no longer a factor in prosecuting those accused of rape. Section 3105 of the Crimes Code, 18 Pa. C. S. §3105. Also, the statute of limitations for rape and incest cases has been extended to five years. Section 5552 of the Judicial Code, *as amended*, 42 Pa. C. S. §5552.

264

ence too formidable for an adult, let alone one of tender age.[31]

Thus, we agree with the Chancellor that the interests enunciated by the Commonwealth are greatly outweighed by the severe invasion of the woman's privacy[32] so as to transgress the constitutional guarantee of privacy.

There are far less intrusive measures that the Commonwealth could adopt to further its stated goals. For example, to prevent fraud and pay only valid claims, and to use funds in the most efficient manner, the legislature could enact legislation delineating abuses of the system to be a crime with penalties which would include reimbursement. A first trimester reporting period to balance the state and individual interest could be adopted. Under this timetable, the Commonwealth's interests would be sufficiently protected, yet the invasion of privacy would not nearly be as severe. A rape or incest victim must at some point come to terms with her unwanted pregnancy in order to obtain an abortion, be it publicly funded or otherwise.[33]

---

[31] *Fischer v. Department of Public Welfare*, 85 Pa. Commonwealth Ct. 215, 236, 482 A.2d 1137, 1146 (1984).

[32] Respondents in their brief point out that "[a]ny rape or incest victim who found it impossible, physically or psychologically, to comply with the 72-hour reporting requirement could not and would not be expected to comply." Respondents' brief in support of post-trial motions, p. 35 n. 20. Such a gratuitous statement of the obvious makes the implicit assumption that the legislature presumed and the Department and courts would so hold in cases of late reporting, where impossibility was used as the reason, that the statute or regulation would be waived.

[33] We would be hard-pressed to find the requirement that victims of incest wanting an abortion would be required to identify their incestuous partner as a condition precedent to state funding constitutional. Such a requirement attempts to coerce the victim into a situation where the immediate problem of the termination of

There is no inconsistency between upholding the constitutionality of the statutes' funding provisions and the striking down of the reporting regulation and statutory provision. They have been decided on entirely different principles. The reporting provisions found to be repugnant to the constitutionally-protected right of privacy are not equivalent to nor were they subject to the same constitutional attack as the general funding sections. Thus, we have upheld the time-honored judicial exercise of legislative scrutiny, upholding those things in accord with the Pennsylvania Constitution and striking those things repugnant to it, though they are part and parcel with other provisions found not to be offensive.

This legislative scheme may not be one to which all of the members of this or any other Court subscribe. Whether we agree or disagree with the desirability, wisdom or consistency of the statutes here in question, the judiciary's role has been defined:

> [T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceeds along suspect lines.

*City of New Orleans v. Dukes,* 427 U.S. 297, 303 (1976). We are also mindful of our state Supreme Court in *Martin,* quoting *Daniel v. Family Security Life Insurance Co.,* 336 U.S. 220, 224 (1949):

> Looking through the form of this plea to its essential basis, we cannot fail to recognize it as an argument for invalidity because this court disagrees with the desirability of the legisla-

---

an incestuous pregnancy is directly related to the victim's willingness to effectuate law enforcement. The connection between the two is so attenuated that one can hardly consider it to be a state interest sufficient to compel its constitutionality.

tion. We rehearse the obvious when we say that our function is thus misconceived. We are not equipped to decide desirability; and a court cannot eliminate measures which do not happen to suit its taste if it seeks to maintain a democratic system. The focus for the connection for ill-considered legislation is a responsive legislature.

We sustain those exceptions of the respondents based on equal protection and the equal rights amendment and overrule the remainder of them.

We overrule the exceptions of petitioners.

### ORDER

Respondents' exceptions to the Chancellor's Conclusions of Law Nos. 1, 2, 3 and 4, and the decree nisi dated March 9, 1984, are sustained; the remainder of respondents' exceptions are overruled. Petitioners' exceptions are overruled.

Judgment is entered in favor of the petitioners with respect to the reporting provisions of the statutes and the Commonwealth is permanently enjoined from their implementation. Judgment is entered in favor of the Commonwealth with respect to the remaining provisions of the statutes.

---

### CONCURRING AND DISSENTING OPINION BY JUDGE MACPHAIL:

Inasmuch as my adjudication is now reported preceding the majority opinion, I feel it is unnecessary to repeat what I said therein. I note that the majority opinion is limited to sustaining exceptions to the conclusions of law I reached. The fair implication that follows is that the facts I found are not disturbed by the majority opinion.

I, accordingly, concur in the result reached by the majority with respect to the unconstitutionality of the

reporting requirements of the statutes under consideration but, for the reasons set forth in my adjudication, I must respectfully dissent to the result reached by the majority that the remainder of the statutes under consideration do pass constitutional muster.

In addition, I believe that the majority in its statement at slip op. pp. 11 and 12 that my analysis would lead to the conclusion that "because a woman has a right to an abortion in certain circumstances under Roe v. Wade, then necessarily, if she is indigent, the state has the obligation to fund this right," misapprehends my adjudication. Clearly, the fact that any woman has the right to choose an abortion under the circumstances delineated in *Roe v. Wade* does not obligate the state to fund all abortions for indigent women. However, where the state funds a full panoply of medically necessary services for indigent persons I found that the state may not then refuse to fund medically necessary abortions for indigent pregnant women.

In summary, I would dismiss all exceptions and enter the decree nisi as a final decree.

Judge CRAIG joins in this concurring and dissenting opinion.