502 A.2d 114

**Joanne FISCHER, et al., Appellants,**

v.

**DEPARTMENT OF PUBLIC WELFARE, Appellee.**

Supreme Court of Pennsylvania.

Argued April 18, 1985.

Decided Dec. 5, 1985.

Kathryn Kolbert, Susan Cary Nicholas, Seth Kreimer, Philadelphia, for appellants.

Stanley Slipakoff General Counsel, Philadelphia, Andrew S. Gordon Deputy Atty. Gen., Harrisburg, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDER-MOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

McDERMOTT, Justice.

This case does not concern the right to an abortion. In *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), reh. den. 410 U.S. 959, 93 S.Ct. 1409, 35 L.Ed.2d 694 (1973), sweeping aside previous prohibitions, the Supreme Court bottomed the right to expel an unwanted pregnancy on the choice of the private uses of one's body. The question here, is whether, because this Commonwealth provides funds to indigent women for a safe delivery, they are therefore equally obliged to fund an abortion.

This dispute had as its genesis the enactment of a provision of the Public Welfare Code which provided that:

Since it is the public policy of the Commonwealth to favor childbirth over abortion, no Commonwealth funds and no Federal funds which are appropriated by the Commonwealth shall be expended by any State or local government agency for the performance of abortion: Provided, that nothing in this act shall be construed to deny the use of funds *where a physician has certified in writing that the life of the mother would be endangered*

*if the fetus were carried to the full term or except for
such medical procedures necessary for the victims of
rape or incest when such rape or incest has been
reported promptly to a law enforcement agency or
public health service.* Nothing contained in this section
shall be interpreted to restrict or limit in any way, appro-
priations, made by the Commonwealth or a local govern-
mental agency to hospitals for their maintenance and
operation, or, for reimbursement to hospitals for services
rendered which are not for the performance of abortions.
62 P.S. § 453.[1] This provision, also referred to as Act 239,
was to become effective on February 15, 1981. However,
on February 12, 1981, appellants [2] filed an original action in
the Commonwealth Court, challenging it on state constitu-
tional grounds.[3] On August 10, 1981, the Commonwealth
Court issued a preliminary injunction against enforcement
of this Act. On appeal we affirmed this preliminary relief.
*Fischer v. Department of Public Welfare,* 497 Pa. 267, 439
A.2d 1172 (1982).

Upon its return to the Commonwealth Court appellees [4]
filed preliminary objections in the nature of a demurrer.
These objections were overruled,[5] and the Commonwealth's
petition for permission to appeal was denied by this Court.
The case was again returned to the Commonwealth Court
and on August 6, 1982, the appellees filed their Answer.
Attached thereto was New Matter wherein they asserted
that the appellant's challenge had become moot as a result
of an intervening repeal of Act 239 by the General Assem-
bly. That repeal was accomplished by the enactment of the

1. Act of December 19, 1980, P.L. 1321, No. 239, § 1.
2. Appellants consist of a taxpayer; several medical assistance recipi-
   ents who, at the time the law suit was filed, were pregnant and desired
   abortions; a clergyman; organizations which provide abortions; and,
   an organization which counsels rape victims.
3. Also, on that date appellants filed an action in federal court. How-
   ever, this action was subsequently withdrawn.
4. Appellees consist of the Department of Public Welfare, the Secretary
   of Public Welfare, and the Deputy Secretary for Medical Assistance.
5. *Fischer v. Department of Public Welfare,* 66 Pa.Cmwlth. 70, 444 A.2d
   774 (1982).

Abortion Control Act of 1982,[6] 18 Pa.C.S. § 3201 *et seq.*, which modified the language of Act 239 to provide as follows:

PUBLIC FUNDS.—No Commonwealth funds and no Federal funds which are appropriated by the Commonwealth shall be expended by any state or local government agency for the performance of abortion, except:

(1) When abortion is necessary to avert the death of the mother on certification by a physician. When such physician will perform the abortion or has a pecuniary or propriety interest in the abortion there shall be a separate certification from a physician who has no such interest.

(2) When abortion is performed in the case of pregnancy caused by rape which has been reported within 72 hours of the rape to a law enforcement agency having the requisite jurisdiction and has been personally reported by the victim or her agent.

(3) When abortion is performed in the case of pregnancy caused by incest which has been reported within 72 hours from the date when the female first learns she is pregnant and she has named the other party to the incestuous act. Such information shall be turned over by the department to a law enforcement agency.

18 Pa.C.S. § 3215(c). This Act was to take effect in December, 1982. However, prior to its effective date appellants filed an amended petition for review challenging its provisions.[7] The Commonwealth again filed an Answer and New Matter, to which appellants responded. Thereafter, the Commonwealth Court granted appellant's motion for class certification, and the matter proceeded.

6. Act of June 11, 1982, P.L. 476, No. 138, § 1 *et seq.*

7. In addition, enforcement of the entire Abortion Control Act was enjoined, per order of the United States Court of Appeal from the Third Circuit, from December 8, 1982, up until July 6, 1984. On that latter date the injunction against portions of the Act was lifted, a result of which the repealer provision became effective, and Act 239, 62 P.S. § 453 was repealed. *See American College of Obstetricians and Gynecologists v. Thornburgh,* 737 F.2d 283 (3rd Cir.1984). Thus, Section 3215(c) remains the only provision challenged in this suit.

On February 1, 1984, the parties filed a stipulation of uncontested facts, and on February 7 and 8, 1984, the Honorable John A. MacPhail, sitting as chancellor, heard additional testimony.

On March 9, 1984, Judge MacPhail issued an adjudication wherein he found both statutes violated the Pennsylvania Constitution, and that the rape and incest reporting provisions violated federal and state rights to privacy. He concurrently issued a *decree nisi* permanently enjoining the Commonwealth from enforcing the challenged provisions. *Fischer v. Department of Public Welfare*, 85 Pa.Cmwlth. 215, 482 A.2d 1137 (1984).

The Commonwealth excepted to this decree, and argument was held before the Commonwealth Court, *en banc.* That court, by a five to two margin, rejected Judge Mac-Phail's conclusions that the restriction of abortion funding to life endangering situations was unconstitutional. The court did however affirm Judge MacPhail's conclusion that the rape and incest reporting provisions offended constitutional safeguards, and the Commonwealth was permanently enjoined from enforcing them.[8] *Fischer v. Department of Public Welfare*, 85 Pa.Cmwlth. 240, 482 A.2d 1148 (1984).

Appellants have appealed from the decision of the *en banc* panel. In their appeal they raise the following issues: whether the funding restriction violates the equal protection guarantees contained in Article I § 1 and Article III § 32 of the Pennsylvania Constitution; whether the funding restriction violates the nondiscriminatory provision contained in Article I § 26 of the Pennsylvania Constitution; and whether the funding restriction violates the Commonwealth Equal Rights Amendment contained in Article I § 28 of the Pennsylvania Constitution. For the following reasons we reject appellant's arguments and affirm the final decree of the Commonwealth Court.

8. We note that the Commonwealth chose not to appeal this aspect of the Commonwealth Court's decision. Therefore, we will not review this issue.

I

Although appellants have not raised any federal claims we must nonetheless begin our analysis with a discussion of the relevant federal constitutional authorities. One of the nuances of living in this federal system is that individual states are free to make certain choices, so long as they do not transgress certain constitutional parameters, as those parameters have been defined by the United States Supreme Court. *See Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980).

In *Roe v. Wade, supra,* the Supreme Court drew the parameters within which all states must operate as regards abortion. The Court held that statutes which made criminal the performance or the obtainment of an abortion unduly burdened a woman's right to choose, and thus constituted an infringement on a woman's right to privacy. At the same time however, the Court acknowledged that states do have an interest in the potential life which may be destroyed; and that the states' interest can justify certain restrictions on the performance of abortions. *Id.,* 410 U.S. at 162, 93 S.Ct. at 731.

Subsequently, the Court recognized that the states' interest in potential life is a significant one "existing throughout the course of the woman's pregnancy"; [9] and that states may take certain steps "to further this unquestionably strong and legitimate interest in encouraging normal childbirth." *Beal v. Doe,* 432 U.S. 438, 446, 97 S.Ct. 2366, 2371–72, 53 L.Ed.2d 464 (1976). The Court later held that there was no constitutional requirement for a state to "accord equal treatment to both abortion and childbirth," *Maher v. Roe,* 432 U.S. 464, 470, 97 S.Ct. 2376, 2380, 53 L.Ed.2d 484 (1977); and that it was not unconstitutional for a state to pay for the expenses of childbirth while at the

9. In *Beal v. Doe,* 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1976) the Court upheld a Pennsylvania Department of Welfare regulation, which provided assistance only for those abortions which were "certified by physicians as medically necessary." *Id.* at 441, 97 S.Ct. at 2369.

same time refusing to pay for nontherapeutic abortions. *Id.*

In *Maher*, the Court explained the limits to the right which they recognized in *Roe v. Wade;*

> *Roe* did not declare an unqualified "constitutional right to an abortion" ... Rather, the right protects the woman from unduly burdensome interference with her freedom to decide whether to terminate the pregnancy. *It implies no limitation on the authority of the State to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds.*

*Id.* at 473–474, 97 S.Ct. at 2382 (emphasis added).

Thereafter, in *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), the Court held that Congress, in pursuance of a policy to encourage childbirth, may limit the funding of abortions to life threatening situations; and that such a restriction does not contravene the constitutional right of those indigent women who seek abortions in less than life threatening situations. The Court also held that a state may enact a statute limiting medically necessary abortion funding without offending the Constitution. *Williams v. Zbaraz*, 448 U.S. 358, 100 S.Ct. 2694, 65 L.Ed.2d 831 (1980).

In *Harris, supra,* the Court addressed the constitutional validity of what has become known as the "Hyde Amendment," which provided:

> [N]one of the funds provided by this joint resolution shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest when such rape or incest has been reported promptly to a law enforcement agency or public health service. Pub.L. 96–123, § 109, 93 Stat. 926.

This amendment was challenged on a number of grounds. For our purposes the Court's discussion on two of those grounds are most relevant. First, the Court rejected the

argument that the amendment's restrictions impinged on the liberty interest protected by the Due Process Clause. Relying extensively on *Maher v. Roe, supra,* the Court noted

> the basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consistent with legislative policy. *Constitutional concerns are greatest when the state attempts to impose its will by force of law; the State's power to encourage actions deemed to be in the public interest is necessarily far broader.* (Citation omitted.) (Emphasis added.)

*Harris, supra,* 448 U.S. at 315, 100 S.Ct. at 2687 (emphasis added). And in addressing the merits of the argument the Court stated:

> But, regardless of whether the freedom of a woman to choose to terminate her pregnancy for health reasons lies at the core or the periphery of the due process liberty recognized in *Wade, it simply does not follow that a woman's freedom of choice carries with it a constitutional entitlement to the financial resources to avail herself to the full range of protected choices.* The reason why was explained in *Maher:* although government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation. Indigency falls in the latter category. The financial constraints that restrict an indigent woman's ability to enjoy the full range of constitutionally protected freedom of choice are the product not of governmental restrictions on access to abortions, but rather of her indigency. Although Congress has opted to subsidize medically necessary services generally, but not certain medically necessary abortions, the fact remains that the Hyde Amendment leaves an indigent woman with at least the same range of choice in deciding whether to obtain a medically necessary abortion as she would have had if Congress had chosen to subsidize no health care costs at all. We are thus not persuaded that the

Hyde Amendment impinges on the constitutionally protected freedom of choice recognized in *Wade.*

*Id.* at 316–317, 100 S.Ct. at 2687–2688 (emphasis added). Therefore, the Court found that the Hyde Amendment did "not impinge on the due process liberty rights recognized in *Wade.*" *Id.* at 318, 100 S.Ct. at 2689.

The second attack against which the Hyde Amendment survived involved an equal protection claim. The Court conclusively rejected the argument that the amendment violated constitutionally protected substantive rights, and/or that it was predicated upon a suspect classification. Concerning the latter point the Court again relied heavily upon *Maher v. Roe:*

> An indigent woman desiring an abortion does not come within the limited category of disadvantaged classes so recognized by our cases. Nor does the fact that the impact of the regulation falls upon those who cannot pay lead to a different conclusion. In a sense, every denial of welfare to an indigent creates a wealth classification as compared to nonindigents who are able to pay for the desired goods and services. But this Court has never held that financial need alone identifies a suspect class for purposes of equal protection analysis. (Citations omitted.)

*Harris, supra* at 323, 100 S.Ct. at 2691.

Since the funding restrictions contained in the Hyde Amendment neither impinged on a fundamental right nor operated to the detriment of a suspect class, the Court's level of scrutiny rose no higher than that of inquiring whether the Congress had a rational basis for the disparate treatment accorded childbirth and abortion. On this issue, the Court concluded:

> It follows that the Hyde Amendment, by encouraging childbirth except in the most urgent circumstances, is rationally related to the legitimate governmental objective of protecting potential life. By subsidizing the medical expenses of indigent women who carry their pregnancies to term while not subsidizing the comparable ex-

penses of women who undergo abortions (except those whose lives are threatened), Congress has established incentives that make childbirth a more attractive alternative than abortion for persons eligible for Medicaid. These incentives bear a direct relationship to the legitimate congressional interest in protecting potential life. Nor is it irrational that Congress has authorized federal reimbursement for medically necessary services generally, but not for certain medically necessary abortions. Abortion is inherently different from other medical procedures, because no other procedure involves the purposeful termination of a potential life.

*Id.* at 325, 100 S.Ct. at 2692.

■ Therefore, under the provisions of the United States Constitution, as interpreted by the United States Supreme Court, it is obvious that funding limitations which favor childbirth over abortion do not offend constitutional safeguards.

## II

Turning to the present case, appellants have argued that we should interpret our state Constitution in a more expansive manner than the United States Supreme Court has seen fit to interpret the federal Constitution. The Commonwealth, on the other hand, argues that in the area of abortion the rights and privileges accorded to the citizens of Pennsylvania are no greater, nor should they be greater, than the rights and privileges granted under the federal Constitution.

## A

Appellants have relied upon four sections of our state Constitution in support of their position. The first two, Article I § 1 [10] and Article III § 32,[11] have generally been

---

**10.** Article 1 § 1 provides:
§ 1. Inherent rights of mankind
All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying

considered to guarantee the citizens of this Commonwealth equal protection under the law. However, appellants would have us apply a different analysis here than that applied to the federal equal protection claim in *Harris, supra.* They specifically urge that we should consider either that abortion, when necessary to preserve one's health, is a fundamental right, or that the classification of indigent women is a suspect one; and that the statute would not bear up under strict scrutiny. In the alternative they argue that even under a rational basis standard, the statute's distinction must fail, since it is neither rational as a social policy nor proper under a constitutional analysis.

■ We begin our equal protection analysis with the recognition that merely because all have the right to do a thing does not require that the Commonwealth is obliged to provide the means to all. When, however, the Commonwealth offers to fund a right they must fund it for all, unless they have a constitutionally valid reason to specify only a certain class as their beneficiaries. It is the nub of equal protection that the Commonwealth cannot give or take from one and not the other unless their reason is to advance or protect a constitutionally recognizable interest of the common weal.

■ As noted above, we are free to interpret our Constitution in a more generous manner than the federal courts; and in the past we have not been shy of utilizing this freedom to afford the citizens of this Commonwealth greater liberties than they would otherwise enjoy. *See Commonwealth v. Sell,* 504 Pa. 46, 470 A.2d 457 (1983); *Commonwealth v. Tate,* 495 Pa. 158, 432 A.2d 1382 (1981); *Commonwealth v. DeJohn,* 486 Pa. 32, 403 A.2d 1283 (1979)

and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

11. Article III § 32 provides in relevant part that:
The General Assembly shall pass no local or special law in any case which has been or can be provided for by general law ... Nor shall the General Assembly indirectly enact any special or local law by the partial repeal of a general law; ...

*cert. denied* 444 U.S. 1032, 100 S.Ct. 704, 62 L.Ed.2d 668 (1980). However, at the same time we have often turned to federal constitutional analysis as an interpretational aid.

In *Kroger v. O'Hara Township,* 481 Pa. 101, 392 A.2d 266 (1978) this Court, in discussing the preferred manner in which we should analyze state equal protection claims stated:

> · Although the view of the United States Supreme Court concerning proper guidelines for its interpretation of the federal constitution is not binding upon us in interpreting the Pennsylvania Constitution, we agree that we should be guided by the same principles in interpreting our Constitution.

*Id.,* 481 Pa. at 117, 392 A.2d at 274. *See Commonwealth v. Kramer,* 474 Pa. 341, 378 A.2d 824 (1977); *Baltimore and Ohio Railroad v. Commonwealth, Dept. of Labor and Industry,* 461 Pa. 68, 334 A.2d 636 (1975) *appeal dismissed* 423 U.S. 806, 96 S.Ct. 14, 46 L.Ed.2d 26 (1975).

In the recent case of *James v. Southeastern Pennsylvania Transportation Authority,* 505 Pa. 137, 477 A.2d 1302 (1984), Mr. Justice Flaherty, writing for the Majority, described the analytical framework for reviewing government actions which affect disparate classes.

> ... [T]here are three different types of classifications calling for three different standards of judicial review. The first type classifications implicating neither suspect classes nor fundamental rights—will be sustained if it meets a "rational basis" test. *Singer v. Sheppard* [464 Pa. 387, 346 A.2d 897 (1975)], *Id.* In the second type of cases, where a suspect classification has been made or a fundamental right has been burdened, another standard of review is applied: that of strict scrutiny. *San Antonio School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Finally, in the third type of cases, if "important," though not fundamental rights are affected by the classification, or if "sensitive" classifications have been made, the United States Supreme Court has employed what may be called an intermediate stan-

dard of review, or a heightened standard of review. *U.S. Dept. of Agriculture v. Murray*, 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767, 775 (1973) (concurring opinion of Mr. Justice Marshall), citing *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). There are, in summary, three standards of review applicable to an equal protection case, and the applicability of one rather than another will depend upon the type of right which is affected by the classification.

*Id.*, 505 Pa. at 145, 477 A.2d at 1306.

■ Therefore, we must first determine the type of right with which we are confronted. As we view it, the right with which we are here concerned is the purported right to have the state subsidize the individual exercise of a constitutionally protected right, when it chooses to subsidize alternative constitutional rights. Such a right is to be found nowhere in our state Constitution, and therefore under the analytical framework which we adopted in *James, id.*, such a right cannot be considered fundamental.

■ Similarly, it is clear that the statute does not affect a suspect class. Like the United States Supreme Court this Court "has never held that financial need alone identifies a suspect class for purposes of equal protection analysis," *Maher, supra,* 432 U.S. at 471, 97 S.Ct. at 2381; and we know of no other jurisdiction which has so held.

Therefore, since the statute affects neither a fundamental right nor a suspect class, the interest of the state need not be a compelling one [12] in order to sustain the burden of justifying the disparate treatment of the two classes of women.

■ The second or intermediate level of scrutiny involves those instances where "an 'important' interest has been affected," and/or "whether sensitive, though not suspect

12. We do not mean to imply that the state's interest in promoting live births is not compelling. What we are saying is that given that the appellants have not established the predicate, we need not test the statute against this standard.

classifications have been made." *James, supra,* 505 Pa. at 146, 477 A.2d at 1306. Those rights which have been considered important enough to warrant this heightened scrutiny have been described as those affecting "liberty" interests, or a "denial of a benefit vital to the individual." *Id.* citing Tribe, *American Constitutional Law,* § 16–31 (1978).

We note that the United States Supreme Court found that neither of these interests were affected by the funding limitations contained in the Hyde Amendment. *Harris v. McRae, supra.* However, even assuming, as appellants impliedly argue, that the funding distinction made in the Abortion Control Act constituted a "denial of a benefit vital to the individual" claimants, we would hold that the restriction here would satisfy the concomitant higher degree of scrutiny, to wit: (1) that the governmental interest be an important one; (2) that the governmental classification be drawn so as to be closely related to the objectives of the legislation; and (3) that a person excluded from the benefit be permitted to challenge the denial on the grounds that his particular denial would not further the governmental purpose of the legislation. *James, supra,* 505 Pa. at 147, 477 A.2d at 1307.

Here the importance of the governmental interest of preserving potential life has been consistently recognized by the United States Supreme Court. That Court has at various times described that right as "valid and important," *Beal v. Doe, supra,* 432 U.S. at 445, 97 S.Ct. at 2371; "important and legitimate," *Harris v. McRae, supra,* 448 U.S. at 324, 100 S.Ct. at 2692, citing *Roe v. Wade,* 410 U.S. at 162, 93 S.Ct. at 731; "significant" and, "unquestionably strong," *Beal v. Doe, supra,* 432 U.S. at 446, 97 S.Ct. at 2371. Moreover, the Court has recognized the unique aspect of abortion as being the only medical procedure involving "the purposeful termination of a potential life." *Harris, supra,* 448 U.S. at 325, 100 S.Ct. at 2692. We also recognize this fact; and to say that the Commonwealth's

interest in attempting to preserve a potential life is not important, is to fly in the face of our own existence.

In addition to the obvious importance of the Commonwealth's interest in preserving potential life, we think that the challenged provision meets the other criterion of the intermediate scrutiny test. Firstly, the governmental classification here is between abortions necessary to save the life of the mother, and all other abortions.[13] The stated purpose of the Act is the preservation of life. In furtherance thereof, the Commonwealth has made a decision to encourage the birth of a child in all situations except where another life would have to be sacrificed. We think such a classification is specifically related to the ends sought, in that it accomplishes the preservation of the maximum amount of lives: i.e., those unaborted new babies, and those mothers who will survive though their fetus be aborted.

Secondly, the appellants have had their opportunity to challenge the denial of abortion funds to them, but have not established, nor do we see how they could establish, that the Commonwealth's denial of funds would fail to accomplish the governmental purpose of preserving the life of the unborn child.

■ Therefore, were we to accept the argument that the present classification warrants heightened scrutiny we would nevertheless find that the distinction passes constitutional muster. However, as the United States Supreme Court concluded in *Harris*, we think the proper standard of review is one of rationality. This, as noted in *James, supra*, is the least restrictive standard by which legislative enactments are reviewed, and it is the standard by which we have traditionally measured distinctions within government benefit programs. *See Martin v. Unemployment Compensation Board of Review*, 502 Pa. 282, 466 A.2d 107 (1983) *cert. denied* 466 U.S. 952, 104 S.Ct. 2156, 80 L.Ed.2d 541 (1984).

**13.** For purposes of this discussion we are excepting abortions which are authorized for rape and incest, since no one at this point is contesting the Commonwealth's action in those situations.

Thus, in order for the classification to sustain constitutional attack it need only be directed at the accomplishment of a legitimate governmental interest, and to do so in a manner which is not arbitrary or unreasonable. For the reasons stated above, and for those stated by the United States Supreme Court, we have no hesitation in concluding that the present classification had, and continues to have, a rational basis.

### B

Appellants have also challenged the statute as being violative of Article I § 26 of the Pennsylvania Constitution, otherwise known as the Commonwealth's non-discrimination clause.[14] They argue that the state has impermissibly discriminated against those persons who will elect to have abortions, by limiting funding to those mothers who elect to carry the baby to full term, or who are faced with a life threatening choice. We disagree.

As appellant notes, we have not previously been called upon to interpret this provision. It is appellants' contention, however, that Article I § 26 affords different and greater guarantees than the equal protection provisions. Again we must disagree.

As former Chief Judge Bowman noted in *McIlvaine v. Pa. State Police*, 6 Pa.Cmwlth. 505, 296 A.2d 630 (1972), in an opinion which this Court subsequently adopted, 454 Pa. 129, 309 A.2d 801 (1973); "Article I § 26 does not in itself define a new substantive civil right." [15] *Id.* at 511, 296 A.2d

---

**14.** Article 1 § 26 provides:

§ 26 No discrimination by Commonwealth and its political subdivisions.

Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right.

**15.** In *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), the Majority's comments on the breadth of the equal protection clause are analogous.

The guarantee of equal protection under the Fifth Amendment is not a source of substantive rights or liberties, but rather a right to

at 633. What Article I § 26 does is make more explicit the citizenry's constitutional safeguards not to be harassed or punished for the exercise of their constitutional rights. It can not however be construed as an entitlement provision; nor can it be construed in a manner which would preclude the Commonwealth, when acting in a manner consistent with state and federal equal protection guarantees, from conferring benefits upon certain members of a class unless similar benefits were accorded to all.

■ Although we have not previously embraced a mode of analyzing claims under Article I § 26, we think that the most appropriate analysis is that utilized by the United States Supreme Court in cases such as *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) and *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974). This has sometimes been referred to as the "penalty" analysis, whereby the focus is whether a person has been somehow penalized for the exercise of a constitutional freedom. However, as the Majority noted in *Maher v. Roe, supra*, that analysis does not warrant relief in a situation such as here where a state merely seeks to encourage behavior by offering incentives, as distinct from where a state refuses to subsidize a person's exercise of a constitutional right.

... Penalties are most familiar to the criminal law, where criminal sanctions are imposed as a consequence of proscribed conduct. *Shapiro* and *Maricopa County* recognized that denial of welfare to one who had recently exercised the right to travel across state lines was sufficiently analogous to a criminal fine to justify strict judicial scrutiny.

If [a state] denied general welfare benefits to all women who had obtained abortions and who were otherwise entitled to the benefits, we would have a close analogy to the facts in *Shapiro*, and strict scrutiny might be appro-

be free from invidious discrimination in statutory classification and other government activity.
*Id.* at 322, 100 S.Ct. at 2691.

priate under either the penalty analysis or the analysis we have applied in our previous abortion decisions. But the claim here is that the State "penalizes" the woman's decision to have an abortion by refusing to pay for it. *Shapiro* and *Maricopa County* did not hold that States would penalize the right to travel interstate by refusing to pay the bus fares of the indigent travelers. We find no support in the right-to-travel cases for the view that Connecticut must show a compelling interest for its decision not to fund elective abortions.

*Id.,* 432 U.S. at 474, 475, fn. 8, 97 S.Ct. at 2383, fn. 8.

■ Therefore, we hold that since the Commonwealth here has not otherwise penalized appellants for exercising their right to choose, but has merely decided not to fund that choice in favor of an alternative social policy, that the Commonwealth's actions are not offensive to the Constitutional guarantees protected under Article 1 § 26.

## C

■ Finally, appellants contend that the statutory classification between pregnant women who choose to give birth, and pregnant women who choose to have an abortion, somehow offends the Equal Rights Amendment of the Pennsylvania Constitution, Article I § 28. Their argument is based upon the contention that all medically necessary services for men are reimbursable, while a medically necessary abortion, which by its nature can only affect women, is not reimbursable. They contend therefore that "the state has adopted a standard entirely different from that which governs eligibility for men." (Appellant's Brief at 48.)

The Equal Rights Amendment was adopted in this Commonwealth in 1971, and provides as follows:

Equality of rights under the law shall not be abridged in the Commonwealth of Pennsylvania because of the sex of the individual.

Article I § 28. The purpose and intent of this amendment has been explained thusly:

The thrust of the Equal Rights Amendment is to insure equality of rights under the law and to eliminate sex as a basis for distinction. The sex of citizens of this Commonwealth is no longer a permissible factor in the determination of their legal rights and legal responsibilities. The law will not impose different benefits or different burdens upon the members of a society based on the fact that they may be man or woman.

*Henderson v. Henderson,* 458 Pa. 97, 101, 327 A.2d 60, 62 (1974).

We have had occasion to apply this amendment numerous times; and we have relied upon it in striking or modifying various rules of law which we found to be offensive to its terms. *See Hartford Accident and Indemnity v. Insurance Commission,* 505 Pa. 571, 482 A.2d 542 (1984); *George v. George,* 487 Pa. 133, 409 A.2d 1 (1979); *Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 368 A.2d 635 (1977); *Adoption of Walker,* 468 Pa. 165, 360 A.2d 603 (1976); *Commonwealth v. Santiago,* 462 Pa. 216, 340 A.2d 440 (1975); *DiFlorido v. DiFlorido,* 459 Pa. 641, 331 A.2d 174 (1974); *Commonwealth v. Butler,* 458 Pa. 289, 328 A.2d 851 (1974); *Henderson v. Henderson, supra.; Hopkins v. Blanco,* 457 Pa. 90, 320 A.2d 139 (1974); *Conway v. Dana,* 456 Pa. 536, 318 A.2d 324 (1974).

In each of the above cases we have vigilantly protected the rights of women and men to be treated without reliance upon their sexual identity. In doing so we have recognized that distinctions which "rely on and perpetuate stereotypes" as to the responsibilities and capabilities of men and women are anathema to the principles of the E.R.A. *Hartford Accident and Indemnity v. Insurance Commission, supra,* 505 Pa. at 584, 428 A.2d at 548.

In the present case, however, we cannot accept appellants' rather simplistic argument that because only a woman can have an abortion then the statute necessarily utilizes "sex as a basis for distinction," *Henderson v. Henderson, supra,* 458 Pa. at 101, 327 A.2d at 62. To the contrary, the

basis for the distinction here is not sex but abortion,[16] and the statute does not accord varying benefits to men and women because of their sex, but accords varying benefits to one class of women, as distinct from another, based on a voluntary choice made by the women.

The mere fact that only women are affected by this statute does not necessarily mean that women are being discriminated against on the basis of sex. In this world there are certain immutable facts of life which no amount of legislation may change. As a consequence there are certain laws which necessarily will only affect one sex. Although we have not previously addressed this situation, other ERA jurisdictions have; and the prevailing view amongst our sister state jurisdictions is that the E.R.A. "does not prohibit differential treatment among the sexes when, as here that treatment is reasonably and genuinely based on physical characteristics unique to one sex." *People v. Salinas*, 191 Colo. 171, 174, 551 P.2d 703, 706 (1976). *See, State v. Rivera*, 62 Hawaii 120, 612 P.2d 526 (1980); *City of Seattle v. Buchanan*, 90 Wash.2d 584, 584 P.2d 918 (1978). *See also, Holdman v. Olim*, 59 Hawaii 346, 581 P.2d 1164 (1978).

Nevertheless, appellants have argued that our decision in *Cerra v. East Stroudsburg Area School District*, 450 Pa. 207, 299 A.2d 277 (1973) precludes us from considering the unique reproductive capabilities of women as a basis for upholding the present statute. We disagree.

In *Cerra*, this Court held that a school district regulation, which required women who were more than five months pregnant to resign, violated the Pennsylvania Human Relations Act.[17] Although the Court declined to address the E.R.A. implications of the regulation, we did say that the regulation constituted "sex discrimination pure and simple." *Id.*, 450 Pa. at 213, 299 A.2d at 280. The basis of the

---

**16.** *See generally, Moe v. Secretary of Administration and Finance,* 382 Mass. 629, 659, 417 N.E.2d 387, 405 (1981) (Dissenting Opinion of Mr. Chief Justice Hennessy).

**17.** Act of October 27, 1955, P.L. 744, § 5 *as amended,* 43 P.S. § 955(a).

Court's decision was that Ms. Cerra was the victim of a presumption that her pregnancy constituted a disability which warranted her dismissal, whereas men "who might well be temporarily disabled from a multitude of illnesses, have not and will not be so harshly treated." *Id.* The focus of the Court was obviously on the varying treatment accorded the state of pregnancy, where despite objective evidence to the contrary, women were presumed to be totally disabled, yet there was not an equivalent presumption applicable to any disability attributable to men.

The present situation is distinct from *Cerra,* since the decision whether or not to carry a fetus to term is so unique as to have no concomitance in the male of the species. Thus, this statute, which is solely directed to that unique facet is in no way analogous to those situations where the distinctions were "based exclusively on the circumstance of sex, social stereotypes connected with gender, [or] culturally induced dissimilarities." *People v. Salinas, supra,* 191 Colo. at 174, 551 P.2d at 706. *See Hartford Accident and Indemnity v. Insurance Commission, supra.*

Therefore, in the context of the present case the Pennsylvania Equal Rights Amendment affords appellant no basis for relief.

### III

In conclusion, we today hold that the challenged funding restriction contained in the Abortion Control Act of 1982 does not violate the terms of the Pennsylvania Constitution. Consequently, we affirm the final decree of the Commonwealth Court.

### JUDGMENT

ON CONSIDERATION WHEREOF, it is now hereby ordered and adjudged by this Court that the Final Decree of the Commonwealth Court is affirmed.